Evelyn ANDERSON, Plaintiff-Appellant,

v.

David EVANS, et al.,
Defendants-Appellees.

No. 79–1730.

United States Court of Appeals,
Sixth Circuit.

Argued April 4, 1981.

Decided Aug. 13, 1981.

As Amended Oct. 7, 1981.

Rice, District Judge, sitting by designation, dissented and filed opinion.

Charles Hampton White, Cornelius, Collins, Higgins & White, Nashville, Tenn., for plaintiff-appellant.

Lyle Reid, Reid & Banks, Brownsville, Tenn., for defendants-appellees.

Before LIVELY and KEITH, Circuit Judges, and RICE,* District Judge.

LIVELY, Circuit Judge.

The plaintiff, a tenured school teacher in the Haywood County, Tennessee system, who was terminated for "conduct unbecoming a teacher" and "inefficiency," appeals the district court's dismissal of her action seeking reinstatement and back pay. In her complaint Mrs. Anderson founded her action on 42 U.S.C. § 1983, alleging violation of the First Amendment right to freedom of speech and the Fourteenth Amendment right to due process of law. The defendants, members of the county board of education and its superintendent of schools, responded to the complaint with a motion to dismiss for failure to state a claim upon which relief may be granted. This motion was accompanied by two affidavits and the transcript of the "Termination of Employment Hearing" before the board of education. The plaintiff then filed a motion for summary judgment. The district court treated the two motions as cross motions for summary judgment, granted that of the defendants and dismissed the action. On appeal the plaintiff relies on the same constitutional arguments made to the district court.

## I.

Evelyn Anderson had taught in the predominantly black Haywood County, Tennessee school system for several years prior to

the 1978–79 school year. As in previous years, for 1978–79 she was assigned as a Title I mathematics teacher at the Douglass Elementary School whose student body was all black. On August 16, 1978, prior to the beginning of classes, the faculty of Douglass were at the school for an "in service" workshop. According to testimony which the board of education credited and which the district court accepted as true, Mrs. Anderson entered an office where the school principal, Mr. Fouse, and the assistant principal, Mr. Baskerville, were working and the following exchange took place:

And she came in and said, "I'm glad to see both of you together. I have something I want to tell you." And then she told us about the incident where two young blacks went into a cafe and robbed the place where her daughter worked. And she said one of the boys slapped her daughter and roughed her up. And she said at that time, "I hate all black folks." She said, "Now, I hate all black folks." She said, "I never did care too much for them in the first place and now I don't care anything about them." I said, "Mrs. Anderson, don't you realize that I am black and Mr. Baskerville is black and all the children here are black?" She said, "That's just the way it is. I can't help it." I said, "Well, I hope they catch them," She said, "I hope they catch anybody to serve the time." I said, "Now here I am, a teacher, principal and a minister. Now, suppose they came in and get me and take me up there and make me serve the time out?" She said, "That wouldn't make any difference with me one way or the other." I said, "Mrs. Anderson, you're at the wrong place. All of your children that you have out here are black. That's just the way it is." She said, "Well, that's just the way it is." And she walked out.

The principal testified that immediately after Mrs. Anderson left the room he called the superintendent of the Haywood County schools, the defendant Cox. Superintend-

---

* The Honorable Walter H. Rice, Judge, United States District Court for the Southern District of Ohio, sitting by designation.

ent Cox directed the principal to check on Mrs. Anderson to be certain she was not abusing the children. Principal Fouse testified that after the conversation of August 16th his relationship with Mrs. Anderson was "marginal." He tried to avoid her because of her attitude about Negroes. Often when he encountered Mrs. Anderson and spoke to her she would just turn her head and look away. The principal described one contact with Mrs. Anderson in some detail. On the first day of school—five days after the conversation recited above—Mrs. Anderson went to Mr. Fouse's office and complained about a new aide who had been assigned to work with her. The new aide was a black woman. In earlier years Mrs. Anderson had had two white aides about whom she had no complaints. The new aide continued to work and Mrs. Anderson continued to complain. On December 6, 1978 Mrs. Anderson wrote Mr. Fouse asking that her aide be replaced, stating, "I can no longer tolerate her attitude or the quality of her work."

Principal Fouse testified that the aide was doing what Mrs. Anderson told her to do, but that Mrs. Anderson "rejected her." At one point Mrs. Anderson threatened the principal with a lawsuit if he did not get rid of the aide. The aide was eventually terminated because Mrs. Anderson refused to give her any work to do. Since the aide was employed under the Title I program she could not be used elsewhere in the school.

The principal also testified that the community learned of Mrs. Anderson's remarks about Negroes and that parents felt she had lost her effectiveness as a teacher. He believed that his strained relationship with Mrs. Anderson greatly affected the efficient and orderly operation of Douglass school.

During the 1978–79 school year Mrs. Anderson received three evaluations from the Title I supervisor and one from Principal Fouse. In most areas she was rated "poor" or "needs improvement" by the supervisor. One comment on the November 14, 1978 evaluation was, "Mrs. Anderson has been very unorganized this year. I feel sure she has problems which we will have difficulty solving." The principal evaluated Mrs. Anderson in many areas as "adequate" and as "good" in a few. However, he rated her total support of the school program, work with other teachers and cooperation with principal and supervisors as "less than adequate." On this evaluation the principal recommended that Mrs. Anderson be transferred. The Title I supervisor testified that Mrs. Anderson's personal problems, particularly with her daughter, kept her upset and affected her attitude in the classroom. This witness detected a deterioration in Mrs. Anderson's teaching ability during the school year.

Superintendent Cox testified that he discussed Mrs. Anderson's situation at several staff meetings before making the decision to file charges. In his opinion Mrs. Anderson's failure to use her aide properly was a sign of ineffectiveness. In addition he concluded that Mrs. Anderson failed to make allowances for individual differences in pupils, a requirement "at the very heart" of the Title I program. The charge of conduct unbecoming a teacher was based on the August 16th conversation with Fouse and Baskerville and on Mrs. Anderson's subsequent conduct. The superintendent concluded that Mrs. Anderson's failure to accept the black aide and her attitude toward her principal indicated that her statements of August 16th were an expression of her true feelings about Negroes rather than an outburst resulting from emotional stress. The witness felt that Mrs. Anderson's attitude destroyed her "whole position" in the 67% black school system.

Two white Douglass teachers testified that they had heard no complaints from parents or students about Mrs. Anderson. These witnesses had not heard of Mrs. Anderson's anti-black remarks to Mr. Fouse and had never heard her make racial slurs. Four black parents testified that they had heard no complaints about Mrs. Anderson. The only witness who testified that the remarks of August 16th were known in the Douglass community was the father of the

black aide who was assigned to Mrs. Anderson and eventually terminated.

Mrs. Anderson testified that she was very upset about the incident involving her daughter and went to the principal to explain why she wasn't mixing with the other teachers and participating fully in the usual school activities. She denied stating that she hated all black people and said she told Fouse and Baskerville that she would be all right, that she just needed to be left alone for a while.[1] Mrs. Anderson testified that she had received no complaints about her teaching or her attitudes. She said the aide's work was unsatisfactory and that she got along well with other teachers. She felt there had been no lessening of her effectiveness as a teacher, though she agreed on cross-examination that a white teacher in an all black school who said, "I hate black people" would not be an effective teacher "if they mean it."

Following the hearing which took place over a period of three days, the board of education voted 4–2 for dismissal of Mrs. Anderson, specifically finding both charges to be true.

## II.

The role of federal courts in actions by teachers and other public employees against their state and local employers is a limited one. The sole function of the federal courts in such litigation is to provide remedial action where constitutional violations by public employers are established. Disputes between public employees and their state and local employers which do not involve the infringement of rights guaranteed by the United States Constitution are properly litigated in state and local courts. In a series of recent cases the Supreme Court has established the procedure to be followed by federal courts when a state or local public employee claims that he has been penalized by his employer for exercising First Amendment rights.

The freedom of speech guarantee of the First Amendment applies to public employees. Nevertheless, as the Supreme Court pointed out in *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968), "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Thus, courts confronted with cases where a public employee claims violation of his right to free expression must balance the interest of the plaintiff against that of the employer "in promoting the efficiency of the public services it performs through its employees." *Id.* The *Pickering* Court concluded that the school board in that case had no significantly greater interest in limiting the plaintiff's public comments than it would have in limiting comments of a member of the general public.

In reaching its conclusion in *Pickering* the Court stated that no evidence was introduced with respect to the effect of the plaintiff's public comments on the community as a whole or on the administration of the school system by which he was employed. 391 U.S. at 567, 88 S.Ct. at 1734. The Court pointed out that the plaintiff in *Pickering* did not have close working relationships with the targets of his public criticism and there was no problem of maintaining discipline by immediate supervisors or harmony among co-workers. It was not shown, and could not be presumed, that criticism of his ultimate employer, the school board, interfered either with the plaintiff's classroom performance or the operation of the school generally. *Id.* at 569–70, 88 S.Ct. at 1735–1736. The Court commented on another problem not present in *Pickering*—public statements by an employee which are so lacking in foundation as to raise questions about fitness to perform class room duties: "In such a case, of course, the statements would merely be evidence of the teacher's general competence,

---

**1.** Counsel for Mrs. Anderson conceded that the version related by the principal and accepted by the school board must be treated as true for the purposes of this appeal.

or lack thereof, and not an independent basis for dismissal." *Id.* at 573 n. 5, 88 S.Ct. at 1737 n. 5. In pointing to conditions not present in the case before it (which was decided for the public employee) the *Pickering* Court gave clues to the sorts of conditions which could lead to a finding that a school board's interest does outweigh that of an employee. Conduct which adversely affects close working relationships, or makes the maintenance of discipline by an immediate supervisor or harmony among co-workers more difficult may lead to such a finding.

■ In *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), the Supreme Court held that private expressions of one's views are entitled to the same First Amendment protection as those made in public. However, since the free speech rights of public employees "are not absolute," *Id.* at 414, 99 S.Ct. at 696, it was concluded that the same balancing is required for private expressions. Referring to personal confrontations between a public employee and her immediate supervisor, the *Givhan* Court stated that "the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time and place in which it is delivered." *Id.* at 415 n. 4, 99 S.Ct. at 696 n. 4.

■ A third recent Supreme Court decision should be discussed. In *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Court held that even where protected conduct plays a "substantial part" in a decision not to renew a teacher's contract, the decision does not "necessarily amount to a constitutional violation justifying remedial action." *Id.* at 285, 97 S.Ct. at 575. The employer should be given the opportunity to show by a preponderance of the evidence that the same decision would have been reached for other reasons even if the protected conduct had not occurred. *Id.* at 287, 97 S.Ct. at 576. This court applied the *Pickering* balancing and the *Mt. Healthy* "test of causation" in *Columbus Education*

*Ass'n v. Columbus City School District*, 623 F.2d 1155 (6th Cir. 1980), and concluded that the school board had failed to offer any evidence to overcome a *prima facie* showing by the plaintiff that he had been reprimanded for engaging in constitutionally protected activity.

■ Other courts have applied the teachings of the three Supreme Court decisions in a variety of factual settings. However, since the facts are determinative of the outcome in each case, no purpose would be served by discussing them. Reading *Pickering*, *Mt. Healthy* and *Givhan* together leads to the conclusion that a two-step analysis may be required when a public employee alleges retaliation for the exercise of her constitutional right to freedom of speech. If the action of the employer is found to have had the effect of limiting the speech of an employee, a balance must be struck between the interest of the employee as an individual and the public interest served by the employer. If it is found that the interest of the state, as employer, in limiting the employee's freedom of expression is significantly greater than any interest it might have in similarly limiting expression by a member of the general public, the public employer's action against its employee does not amount to a constitutional violation requiring remedial action. This finding ends the court's inquiry. However, if the interest of the public employer does not satisfy the *Pickering* test, a *prima facie* case for remedial action is established. The next step is to determine whether the employer has shown that the same decision would have been made on independent grounds unrelated to the employee's protected conduct. Unless this showing is made, the employee is entitled to prevail. *Mt. Healthy, supra.*

### III.

The district court did not state specifically that it had conducted the required balancing in the present case. In other circumstances the proper procedure might be to remand for such action by the trial court. However, the district court's recitation of

the "basic facts" in its judgment order and its statement that "the remarks and accompanying conduct of plaintiff are not entitled to first amendment protection *under the circumstances of this case*" (emphasis added), at least imply that a balancing has taken place. More important, however, is the fact that counsel for Mrs. Anderson, both in brief and oral argument, stated that all the evidence is in the record before us and requested this court to conduct the required balancing on the basis of the record. It is for this reason that we have set forth such a full statement of facts.

It appears to the court that many of the factors which were missing in *Pickering* and *Givhan* are present in this case. The remarks of Mrs. Anderson were made to the principal of her school, her immediate supervisor with whom a close working relationship existed. The nature of the remarks created tension between teacher and principal and made a normal relationship difficult in a situation where cooperation is necessary.[2] Further, Mrs. Anderson continued to evidence hostility or resentment toward Mr. Fouse during the school year as evidenced by her failure to return greetings and her efforts to avoid conversation. Unlike *Pickering*, there was evidence that Mrs. Anderson's remarks and subsequent conduct did have a detrimental effect in the Douglass school and the community it served. In addition, there was evidence that Mrs. Anderson's effectiveness as a teacher was adversely affected by her attitude. Her evaluations were consistently in the fair to poor range and her supervisor testified that her performance as a teacher deteriorated during the year. This was ascribed to her personal problems and attitude. This witness stated that children in the remedial Title I program particularly are affected by a negative attitude and need love, attention and individual care. The inability of Mrs. Anderson to work with the aide assigned to her—a fact which reduced her efficiency—could inferentially

be traced to her animosity toward all blacks.

Also, unlike *Pickering*, this case is one where the nature of the employee's remarks cast serious doubt on her judgment and general competence as a teacher. The circumstances of the Douglass school are an important factor in balancing the competing interests. Mrs. Anderson's remarks were made to two black colleagues on the faculty of a school whose entire student body was black. The likely effect on her hearers and the community served by the school was obvious.[3] Conceding her right to make such statements, the court finds that the interest of the school board in maintaining an efficient and regularly functioning school system and in employing effective teachers outweighed Mrs. Anderson's interest in making the remarks and concludes that her dismissal was not an unconstitutional act. The circumstances of this case gave the school board an interest in limiting Mrs. Anderson's freedom of expression which it could not have claimed with respect to the general public. *Pickering*, 391 U.S. at 573, 88 S.Ct. at 1737.

Having determined that the interest of the school board outweighed that of Mrs. Anderson, we do not reach the *Mt. Healthy* question of whether the same decision to terminate the plaintiff would have been reached for other reasons in the absence of her racial remarks.

## IV.

The due process arguments of the plaintiff are not entirely clear. If it is contended that Mrs. Anderson was not given adequate notice of the charges, the record does not support her. The superintendent sent Mrs. Anderson a copy of the charges along with a resolution of the school board finding that the charges warranted dismissal if found to be true, and advice of her legal rights and recourse under Tennessee law. The charges were as follows:

---

2. Douglass was a small school. It had a total enrollment of 240 pupils and a faculty of 12 teachers. Both the principal and assistant principal also served as classroom teachers.

3. There was evidence of the adverse reaction to Mrs. Anderson's remarks among workers in the school cafeteria, all of whom lived in the Douglass community.

The specific offenses with which I charge Ms. Anderson are as follows:

1. Ms. Anderson is guilty of conduct unbecoming a teacher as is evidenced by racial remarks made to the administrative staff of Douglass School which subsequently have spread into the community.

2. Ms. Anderson is guilty of inefficiency as is evidenced by a decline in her teaching performance during the 1978–79 school year.

 The charge of "conduct unbecoming a teacher," amplified as it was in the notice, is not vague or indefinite. The charge was taken directly from a statute which lists the causes for which a teacher may be dismissed. Tenn. Code Ann. § 49–1412. "Conduct unbecoming a member of the teaching profession" is among the causes defined in Tenn. Code Ann. § 49–1401(11).[4] A similar statutory definition of a cause for which a military officer may be punished, "conduct unbecoming an officer and a gentleman," was sustained in the face of a charge of vagueness in *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). See also *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), where the Court upheld a statute which authorizes the removal of civil service employees "for such cause as will promote the efficiency of the service." Certainly the charge of "inefficiency" was not vague. Mrs. Anderson knew of her unfavorable evaluations.

 This court finds that the plaintiff had adequate notice of the charges. She was given a full hearing at which she was represented by counsel and has pointed to no procedural irregularities. Mrs. Anderson's contention that the action of the board of education in dismissing her rather than transferring her to another school was "overboard" is without merit. The statute under which she was dismissed authorizes either suspension or dismissal of a teacher whose conduct or performance brings her within certain defined causes. The statute leaves the choice of the level of discipline to the board. See Tenn. Code Ann. § 49–1416(8). There is no attack on the constitutionality of Tenn. Code Ann. § 49–1412 either in the pleadings or the briefs of the plaintiff, and no proof of an abuse of discretion was offered.

The judgment of the district court is affirmed.

RICE, District Judge, dissenting.

I

Evelyn Anderson was a tenured school teacher at the Douglass Elementary School in the Haywood County School System in Western Tennessee. Douglas is a relatively small school with a predominantly black student body, but an integrated faculty. Anderson is white. In early August, 1978, Anderson's daughter was assaulted by two black men during a robbery at a restaurant where the daughter worked. On August 13, 1978, during an "in-service" day preceding the formal opening of the school term at Douglas, Anderson found the principal and assistant principal, both black, alone in a room at the school. She initiated a discussion with them concerning the incident involving her daughter. During the course of that discussion she said, "I hate all black folks.... I never did care too much for them in the first place and now I don't care anything about them." She also said that she hoped some black would be caught "to serve the time" for what happened to her daughter, and that it "wouldn't make any difference with me one way or the other" if the Douglas principal, with whom she was speaking, were made to "serve the time out." Anderson was discharged as a teacher with the Haywood County School Sys-

---

4. One of the definitions of "conduct unbecoming a member of the teaching profession" is "disregard of the code of ethics of the Tennessee education association ...." Tenn. Code Ann. § 49–1401(11)(d). The preamble of the Code of Ethics of the Tennessee Education Association affirms that educators believe "in the worth and dignity of each human being ...."

tem, on June 7, 1979, for having made these remarks.[1]

In July, 1979, Anderson filed suit against the school system and its officials in the federal district court at Jackson, Tennessee, claiming, *inter alia*, infringement of her First Amendment rights in that the termination of her public employment was in retaliation for protected expression. In October, 1979, the district court orally sustained the defendants' motion to dismiss, treated as one for summary judgment. In a written decision filed in November, 1979, the district court explained that it was of the opinion that Anderson's statements in August, 1978, were "not entitled to First Amendment protection under the circumstances of this case."

The majority of this panel now affirms the district court's decision. Because I conclude that both the opinions of the court below and the majority failed to address certain considerations required under *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) and the First Amendment, I must respectfully dissent. Because I am also not unmindful of the temerity required of a district judge in dissenting from the opinion of an appellate panel on which he sits by designation, I set forth my reasons for disagreement, below, as briefly as possible.

## II

As a matter of substantive First Amendment law, there is little that can be said of the decision of the district court because the rationale for its decision is not explicitly articulated therein. We do know that the district judge concluded that Anderson's statements "have no relation to political commentary," and that "[t]here is no public interest which can be served by allowing

teachers to make racist remarks consisting of expressions of hatred and threats against black people, to the staff of a school."[2] Citing only *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), and *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), and without any detailed analysis, the district judge then stated his ultimate conclusion, quoted above, to the effect that Anderson's statements were not protected expression in the context of this case.

In review of the decision below, the majority opinion recognizes that a "balancing" of interests is required as a matter of substantive First Amendment law in order to determine whether Anderson's statements are or are not protected under the circumstances of the case. However, the majority finds no obstacle to affirmance of the decision below, even in the face of the district court's evident failure to weigh the competing interests as required. Instead, the majority says that certain passages in the district court's decision "at least imply that a balancing has taken place," and that a balancing of interests, *as now conducted by the majority of this panel*, confirms the correctness of the lower court's decision.

Further below, I state my concerns regarding this novel procedure in *sua sponte* correction of the decision of the lower court. Presently, I state why I believe that the majority of this panel is in error in striking the balance of interests against Anderson.

The majority opinion misstates the analysis applicable to a claim of public employee discharge in alleged retaliation for First Amendment expression. The majority articulates a "two-step" analysis, drawn primarily from *Pickering v. Board of Educa-*

---

1. As a factual matter, other reasons were also given for discharging Anderson. However, neither the court below nor the majority of this panel reached the question whether the other reasons were independently sufficient to justify or cause Anderson's discharge. It is, therefore, quite proper to assume for analytical purposes, that Anderson was discharged solely because of her statements.

2. It is difficult to understand how Anderson's statement might be considered as "threats," but there is no question that, on their face, the sentiments illustrate unmitigated contempt for blacks. The statements are certainly "racist."

*tion, supra,* the "first step" of which is described by the majority herein, as follows:

> ... a balance must be struck between the interest of the employee as an individual and the public interest served by the employer. *If it is found that the interest of the state, as employer, in limiting the employee's freedom of expression, is significantly greater than any interest it might have in similarly limiting expression by a member of the general public, the public employer's action against its employee does not amount to a constitutional violation requiring remedial action. This finding ends the court's inquiry.* (Emphasis added) Majority opinion at 158.

According to the majority opinion, the "second step," pursuant to *Pickering,* which is triggered by a finding of *"no* significantly greater state interest" under the "first step," is to inquire into the existence of grounds for discharge unrelated to the protected expression. Because the majority of the panel makes the finding specified under its "first step," its inquiry "ends," and it does not proceed to consider whether Anderson might have been properly discharged on grounds unrelated to her statements.

In *Pickering,* the Supreme Court established in very straight forward and simple terms the "balancing test" applicable to this case. The Court said:

> The problem in any case is to arrive at a balance *between the interests of the teacher, as a citizen,* in commenting upon matters of public concern *and* the *interest of the State, as an employer,* in promoting the efficiency of the public services it performs through its employees. (Emphasis added)

*Id.* 391 U.S. at 568, 88 S.Ct. at 1734–1735.

I submit that the "first step" in the majority's "two-step" analysis in this case, by which it completely disposes of Anderson's First Amendment claim, does not consider what interest, if any, Anderson may have

had in making the statements at issue, as is clearly required by *Pickering.* The preamble to the "first step," to be sure, does pay lipservice to the employee's interest. And the heart of the "first step"—i.e., the dispositive, "inquiry ending" finding emphasized in the excerpt, above—does require a balancing of sorts. But what is it that the "inquiry ending" part of the "first step" compares? It balances the *state's interest* in limiting the employee speech in question against a hypothetical *state's interest* in limiting similar expression by the public generally. According to the majority of this panel, if the first *interest of the state* (i.e. *qua* employer) is "significantly greater" than a second, hypothetical *interest of the state* (i.e., vis a vis the public in general), then the inquiry abruptly ends and judgment is properly entered against the employee's claim.

So where is it in the majority's "first step" that the employee's interest is taken into account? It is not. Accordingly, it is not surprising that in the course of the majority's review of the record [3] relating to Anderson's First Amendment claim, there is no mention of any possible interest on Anderson's part in having made her statement (nor, for that matter, any mention of the possible value of those statements, at large, to the state or the public generally), save for bare conclusions at the end of the "first step" analysis to the effect "that the interest of the school board outweighed that of Mrs. Anderson." Under the "first step" analysis as articulated and applied by the majority, *only the state's interest* in penalizing Anderson's statements is considered. Because this approach does not provide support for the comparative conclusion finally reached, the majority opinion impermissibly circumvents the balancing test established by *Pickering* as well as the requirements of the First Amendment.

I hazard to suggest that the majority may have erroneously structured the "first

---

**3.** The "record" on appeal is not much different than the "record" on which the district court made its decision. The bulk of the record in either case consists of the transcript of a three-day predismissal hearing, the same evidence upon which the Haywood County Board of Education voted for Anderson's dismissal.

step" of its analysis by relying on certain language in *Pickering* which is simply not on point. In one part of the *Pickering* opinion there is, indeed, language strikingly similar to the majority's "first step," which compares the state's interest in limiting employee expression with the state's interest in limiting expression by the public generally. The *Pickering* Court found that, in the circumstances of that case, the first interest was "not sufficiently greater" than the second. *Id.* at 573, 88 S.Ct. at 1737.

However, the *Pickering* Court did not even remotely suggest that a *contrary* finding (which the majority reaches in this case) would be reason enough—or, for that matter, reason at all—to justify discharging a teacher for alleged protected expression. Indeed the *Pickering* Court could not have made such a suggestion consistent with the clear and simple standard it articulated to govern teacher discharge cases, which is based upon a balance of state *and* employee interests. I would suggest that a close examination of the subject language in *Pickering, in context,* indicates that the Court was merely summarizing its reasons for rejecting a collateral contention, to wit: that a public employee might be held to a higher standard of care regarding the truth of his expression, than that applicable to the public generally. *See id.* at 570–573, 88 S.Ct. at 1735–1737. That matter has absolutely no relevance to this case.

### III

Therefore, as a matter of substantive First Amendment law, a balance must be struck between the state's interest in penalizing Anderson for her statements *and* Anderson's interest in having made the statements, before it can be concluded that Anderson's discharge for having made the statements was proper. The district court did not conduct the requisite balancing, or at least did not clearly indicate that it had done so. The majority of this panel says it appears the lower court may have, at least implicitly, engaged in balancing, and then undertakes a balancing of its own to demonstrate the correctness of the decision be-

low. As indicated above, the balancing conducted by the majority errs in failing to consider Anderson's interest in making the statements at issue.

The Court below said that "racist remarks consisting of expressions of hatred and threats against black people" are not protected by the First Amendment, or at least not protected under the circumstances. The majority opinion herein does not overtly demean Anderson's statements in the same manner, but in failing to consider either Anderson's interest in making them, or First Amendment values at large, it is clear that any and all possible justification for the statements was considered *de minimus* in reaching the decision to affirm.

What possible interest on Anderson's part could weigh against the "imposing" state interest in penalizing her statements? Anderson says she made the remarks in a distraught state of mind, in an attempt to explain to her superiors why she might have difficulty in getting along with blacks on the Douglas staff for a period of time, due to the incident involving her daughter. In short, Anderson would characterize the statements as an emotional plea for understanding or, perhaps, help. (Her discharge indicates that the plea, if that is what it was, was misunderstood or rejected.)

I do not think that the First Amendment requires such innocent or benevolent purpose in expression before it will extend its protection. The First Amendment is simply not that grudging in its offices. Therefore, I find it unnecessary to accept Anderson's proffered reason (or excuse) for her statements, and I find it unnecessary to fashion any other excuse for them at this time. I accept the statements for what they are on their face—statements of unmitigated hatred and contempt for blacks.

But I submit that the statements, so understood, are no less deserving of First Amendment protection than if there had been a reason for making them which would have been readily acceptable to Anderson's superiors, the judge below, or the other members of this panel. I submit that a compelling justification for making the

statements lies not in their content or any circumstance peculiar to this case, but in Anderson's interest (indeed, the interest of the state and the public as well) in her First Amendment rights. In other words, we need not trace Anderson's interest to her specific purpose or motivation for the expression. Her interest, which I believe should weigh heavily against that of the state in most circumstances, is simply that interest in the exercise of the right to free and unimpeded expression, without reprisal, to which all of us are *prima facie* entitled under the Constitution.

*We* may not agree with Anderson's statements. *We* may think them unreasoned, insane, ignorant and obnoxious. *We may* perceive no public value in them. But *our* disagreement or *our* disrespect must never cause us to determine to hastily quiet those who cause us discomfort. Indeed, it is our disagreement and our disrespect, and, more importantly, our thoughtful reflection on why we disagree or have disrespect, which the First Amendment invites. I think it only slightly stretches the point to remind ourselves that it was the "insane, unreasoned, and obnoxious" voices of "black America" which gave "white America" substantial discomfort in recent years, and alone produced the advances (albeit, quite minimal to date) in federal legislation and private affirmative action which are designed to alleviate racial discontent. Do we now approach contrary racial statements (such as Anderson's) with a predisposition that our society has been racially perfected, and that such statements no longer have "public value." We should not. At end, Anderson's statements may prove to be worthless, but that determination is for the "marketplace of ideas," trade in which the First Amendment seeks to facilitate, and not for Anderson's superiors, the court below, or the members of this panel.

I do not mean to argue that Anderson should not have been discharged for her statements. It should be evident from other parts of this dissent that I recognize that there may be a legitimate state interest in penalizing Anderson's statements, under the circumstances, which would outweigh the substantial value ordinarily accorded to free expression under the First Amendment. That is what the *Pickering* balance, when properly conducted, is all about.

My point simply is that the decision of the court below in condemning Anderson's statements fails to address and carefully consider or balance the First Amendment values which I have emphasized. Even if a properly conducted *Pickering* balance would produce the same result, it is incumbent upon the deciding court to at least acknowledge the weight of those values, if not to accord them a prominent position in a careful analysis which shows why, under the circumstances, they must regrettably give way to a legitimate countervailing state interest.

The same comments must be applied to the majority opinion. In its preoccupation with the applicable test, standard, or analysis, not a single reference is made regarding how the analysis finally adopted serves to enhance First Amendment values, or preserves those values except as is absolutely necessary under the circumstances. I would remind the majority that, for all practical purposes, it might develop and apply *any* specific test or standard to govern the disposition of First Amendment claims. But if this Court, or any court, develops and applies a test without *consciously relating* its judicial craftsmanship to the core values of the First Amendment—choosing instead to safely measure the Amendment's protection by intricately structuring "steps of analysis," "levels of scrutiny," "shifting balances," or what have you—it will only be by random chance that the decision produced in any case might actually be responsive to what it is that the First Amendment does command. *Cf.* Saphire, *The Search for Legitimacy in Constitutional Theory: What Price Purity?* 42 Ohio St.L.J. 335 (1981).

IV

In addition to the failure of the lower court to properly apply the *Pickering* balancing test, there is also a procedural reason for questioning the result, herein. The

case comes to this Court following the entry of a *summary judgment* in the Defendants' favor below. If *Pickering* teaches us anything regarding the analysis of First Amendment claims in teacher discharge cases, it is that the requisite balancing of interests involves an intensive *factual inquiry into all the circumstances of each case. Id.* at 568–75, 88 S.Ct. at 1734–1738 *passim.* I am surprised that the court below thought there was no reason that a balance could not be *conclusively* struck against the liability of the Defendant on a record which is clearly conflicting on material facts and, hence, totally inadequate for summary judgment under the Civil Rules.[4] I regret that the majority of this panel would affirm such an error and then practice it itself.

That the evidence on the record does conflict regarding facts material to a determination of the nonliability of the Defendants is clearly demonstrated by the majority's own opinion, herein. For example, the majority concludes that *Pickering* is distinguishable (in result) because of evidence on this record which shows that Anderson's statements were merely reflective of a deteriorating competence at teaching black children (due to her attitude toward blacks), and because of evidence showing adverse community reaction toward Anderson's statements. If these matters were *conclusively* demonstrated by this record, I too would have no problem in considering them against Anderson in a *Pickering* balance, as measures of the state's interest in promoting efficiency—even on motion for summary judgment—since *Pickering* specifically suggests considering such facts in striking the balance.

Those facts, however, are not conclusively demonstrated by this record. It is true that, following her statements, Anderson received "mixed reviews" in several performance evaluations, one by the school principal and three by a special supervisor in Anderson's particular program of instruction. Significantly, the poorest evaluation was by the principal to whom Anderson had made her remarks in August, 1978. There is evidence on the record indicating that his evaluation was made after only one, very brief, in-class observation. The other supervisor's evaluations actually reflected an improvement in Anderson's teaching performance between August, 1978, and the time of her discharge ten months later. Except for the parent of an aide whose employment Anderson had played a role in terminating, no parents voiced dissatisfaction with Anderson's teaching abilities or performance during the period in question. On this record, it remains a triable issue of fact, material to a proper assessment of the *Pickering* balance (and, thus, liability), whether Anderson was in fact incompetent in teaching black children, much less whether her statements might in fact reflect such alleged incompetence.

The notion that adverse community reaction to Anderson's statements might be considered in conclusively striking the *Pickering* balance against Anderson on this record is equally curious. There is little evidence that Anderson's statements were generally known in the community, and no evidence that she might be responsible for any dissemination of her statements which may have occurred. The parent of the discharged aide testified before the school board that the statements were widely known;[5] four other black parents and two

---

4. Fed.R.Civ.P. 56(c) provides that a motion for summary judgment shall be rendered forthwith if the pleadings, depositions, ... and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Although counsel for both parties stated at the hearing held before this panel that the balancing required by *Pickering* could be conducted on the basis of the record herein, such repre-

sentations cannot abrogate or substitute for the Court's duty, which is mandated by Rule 56; to determine whether there are genuine issues of material fact, and further, cannot establish the presence of undisputed facts where an analysis of the record clearly indicates that material factual discrepancies exist.

5. That parent was unable to name any other person in the community who knew of the statements.

teachers testified to the contrary. Certain cafeteria workers at Douglas who lived in the community knew of the statement but apparently heard of it through the school principal, not from Anderson.[6] Again, on this record, it remains a triable issue of material fact whether Anderson's statements were known in the community and, if so, whether they were so widely known that they could be said to adversely affect the operation of the school in the community (thereby tending to justify Anderson's discharge under the *Pickering* balance).

Simply stated, there is not one undisputed or indisputable fact on this record which conclusively shows that Anderson's statements "have in any way impeded the teacher's proper performance of [her] daily duties in the classroom or ... have interferred with the regular operation of the schools generally." *Pickering* at 572–73, 88 S.Ct. at 1736–1737 (footnote omitted). This case was simply not in a proper posture for summary judgment below, and its posture does not improve on appeal.

But even assuming, arguendo, that a *Pickering* balance might be properly and conclusively struck on this record, I have substantial reservations, in any event, in having the necessary factual determinations made by an appellate court in order to correct a trial court's decision. I, like Justice Stevens, believe that it is for a trial court in the first instance to "decide whether there is any need for further proceedings on the issue"—assuming, of course, in the context of this case, that the trial court shows (or is instructed on) the proper regard for the need to balance, and the necessity of doing so in a reviewable manner. *Cf. Givhan, supra* 439 U.S. at 417, 418, 99 S.Ct. 697, 698 (Stevens, J., concurring). The balancing decision, which requires a special facility for understanding and dealing with factual issues (e. g., by limited evidentiary hearing or trial on the merits), is simply beyond the ordinary competence of a court of appeals.

For all of the forestated reasons, I respectfully dissent.

---

**6.** The point here is that the cafeteria workers were told of the statements because it was thought necessary that they monitor Anderson's interrelationship with the students. Thus, contrary to the impression left by the majority's opinion, if the cafeteria workers' knowledge is considered significant community knowledge, it should be correctly identified as the beneficial product of a specifically intended safeguard rather than the effluent of a percolating community rumor-mill.

But there is a related matter which, while largely unimportant at this stage, deserves some attention. The question is presented whether Anderson should at all be held responsible for any broad dissemination of her statements if it was the school principal, and not Anderson, who actually committed the indiscretion of retelling such sensitive matters which were originally told in private. I should think that the answer to this question is obvious. Certainly, the state cannot be permitted to bootstrap a justification for discharging an employee because of his expression by publishing that expression, at large, in order to procure the adverse affect which would support the discharge. On the other hand, the state is entitled to a legitimate reaction to its employee's expression, including, for example, what *might* have occurred in this case, in the principal's communication of the statement to others as thought necessary to monitor and safeguard Anderson's interaction with the students. Under such circumstances, it would be reasonable to hold the employee responsible for widespread secondary and tertiary communications of the expression, and for any adverse effects resulting therefrom. If there was broad community knowledge of Anderson's statements in this case, exactly how it came about would, therefore, also suggest a material issue of fact.