**CITY OF INDIANAPOLIS,**
**Appellant–Defendant,**

v.

**James HEATH, Appellee–Plaintiff.**

No. 49A02–9612–CV–804.

Court of Appeals of Indiana.

Nov. 19, 1997.

Andrew P. Seiwert, Indianapolis, for Appellant–Defendant.

John K. Kautzman, Ruckelshaus Roland Hasbrook & O'Conner, Indianapolis, for Appellee–Plaintiff.

## OPINION

FRIEDLANDER, Judge.

The City of Indianapolis appeals the Marion Superior Court's reversal of a decision of the Indianapolis Civilian Police Merit Board (the Merit Board) which upheld the suspension of Officer James R. Heath of the Indianapolis Police Department (IPD) for statements he made in violation of IPD rules and regulations. The City presents the following issue for review:

> Police officer Heath, while addressing a public meeting and dressed in a police

uniform as a representative of the Indianapolis Police Department intentionally referred to Indianapolis Mayor Stephen Goldsmith as "Goldstein" while commenting upon the Mayor's fiscal policies. Were Officer Heath's remarks protected speech under the federal and state constitutions?

We reverse.

These are the facts. Officer Heath is a veteran IPD police officer. In the days following the bombing of the Alfred P. Murrah Building in Oklahoma City, attention was turned nationwide onto the activities and members of private militia and paramilitary groups because of the belief held by some at the time that a militia group may have been responsible.

In early May of 1995 in Indianapolis, television station WTHR–TV aired a five-part series entitled "Patriot Powder Keg", focusing on militias in Central Indiana. On May 3, part 3 of the series featured Heath, in uniform as a representative of the IPD. When off duty, Heath is a leader of a Johnson County militia group.[1] The program included clips of interviews with Heath filmed while riding in Heath's patrol car. The program also included excerpts of a speech Heath delivered to a militia group called the Sovereign Patriots. Although the meeting was held in the Jonathan Byrd's Cafeteria located in Greenwood, Indiana and was open to the public, it appears that the footage of Heath's speech was taken by a concealed camera.

In the video of Heath's presentation, he is depicted as making the following comment: "We've seen power corrupt, abuse of power with kings, queens, mayors, Mayor Goldsmith. What do we call him? I better not say it, ah well, we call him Goldstein." *Record* at 9.

On May 5, IPD Police Chief James Toler served Heath with notice that his comments

---

1. Johnson County Sheriff J.D. Richards submitted a letter in support of Heath in the proceeding before the Merit Board. In the letter, Richards described the Johnson County Militia as follows:

   Jim is commander of the Johnson County militia. His group is totally pro-government and law enforcement. Jim has said-and will not allow any member of his organization to do

anything against the law or community mores and values. He has volunteered his unit to me several times should there be a disaster of some kind....

Page 38 of the transcript of the hearing before the Indianapolis Civilian Police Merit Board (hereinafter "Merit Board Transcript"), *Record* at 27.

had violated several IPD rules and regulations because he had made anti-Semitic remarks about the Mayor. As a result, Heath was demoted from sergeant to patrol officer and was suspended for thirty days without pay. Heath appealed his demotion and suspension to the Merit Board, which conducted a hearing and affirmed the sanctions. Heath thereafter appealed the Merit Board's decision to the Marion Superior Court.

The parties submitted briefs and the trial court conducted a hearing in the matter. The court reversed the Merit Board's decision, issuing the following conclusions of law:

1. Officer Heath's statement, while perhaps inappropriate and even offensive to some members of the community, was protected speech under the First Amendment to the Constitution of the United States and Article I, § 9 of the Constitution of the State of Indiana.

2. There is no evidence in the record which would support the Merit Board's finding that Officer Heath's conduct was detrimental to the efficient operation and the general discipline of the Indianapolis Police Department.

3. The Merit Board failed to demonstrate a compelling reason for the disciplinary action taken against Officer Heath when balanced against his free speech guarantees under the Constitution of the United States and the Constitution of the State of Indiana.

4. The Merit Board's decision was arbitrary and capricious, unsupported by substantial evidence, and violated constitutional principles as applied to Officer Heath.

*Record* at 102–03. The City appeals the Marion Superior Court's decision.

This court has recently set out the standard by which a public employee's protected speech is measured:

"The law is clear that public employees do *not* abandon their First Amendment rights upon entering the work place. '[A] State cannot condition public employment on a basis that infringes the employee's constitutionality protected interest in freedom of expression.' As noted in *Connick [v. Myers* (1983) ] [461 U.S. 138, 145, 103 S.Ct.

1684, 1689, 75 L.Ed.2d 708], the First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people. '[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.' Accordingly, the U.S. Supreme Court has frequently reaffirmed that speech on public issues occupies the 'highest rung of the hierarchy of the First Amendment values,' and is entitled to special protection. A three-part test for determining whether an employee was wrongfully discharged for 'speech' was developed in *Connick.* This test was recently discussed by the Indiana Supreme Court in *Indiana Department of Highways v. Dixon* (1989), Ind. 541 N.E.2d 877, 881 as follows:

'First, the employee must be speaking on a matter of public concern about which free and open debate is vital to the decision making of the community. Second, the reviewing court must balance the interests of the employee, as a citizen, in commenting upon matters of public concern and the State's interest, as an employer, in running an efficient operation. Third, the employee's protected conduct must be a motivating factor in the State's decision to [discipline the employee.]' [Citations omitted.]" (Emphasis in original.)

*Lach v. Lake County,* 621 N.E.2d 357, 358 (Ind.Ct.App.1993), *trans. denied,* (quoting *Campbell v. Porter County Bd. of Com'rs,* 565 N.E.2d 1164, 1167 (Ind.Ct.App.1991)). A fourth step was added by the United States Supreme Court in *Waters v. Churchill,* 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). Pursuant to *Waters,* a court must determine whether the employer conducted an adequate investigation of the speech in question. The burden is upon the State to justify the imposition of sanctions. *Indiana Dept. of Highways v. Dixon,* 541 N.E.2d 877 (Ind.1989).

■ The first part of our inquiry requires a determination of whether Heath's speech addressed a matter of public concern. "Whether an employee's speech addresses a matter of public concern must be determined

by the content, form, and context of a given statement, as revealed by the whole record." *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690. The *Connick* court described speech upon matters of public concern as "relating to any matter of political, social, or other concern to the community." *Id.* at 146, 103 S.Ct. at 1690. Such inquiry focuses not upon what might incidentally be conveyed by the fact that an employee spoke in a certain way, but rather upon "the *point* of the speech in question." *Dambrot v. Central Mich. Univ.,* 55 F.3d 1177, 1187 (6th Cir.1995) (quoting *Linhart v. Glatfelter,* 771 F.2d 1004, 1010 (7th Cir.1985)). We must ask to what purpose the employee spoke. *Dambrot,* 55 F.3d 1177.

The record is susceptible to differing interpretations concerning the context in which the statement in question was made. The videotape aired by WTHR–TV depicts Heath making an apparently unsolicited comment about Mayor Goldsmith while addressing the use of power in government. However, Heath testified before the Merit Board that after stating "We've seen power corrupt, abuse of power with kings, queens, mayors," *Record* at 9, there ensued a discussion of Mayor Goldsmith's fiscal policies that was initiated by members of the audience. According to Heath,

> I said that everybody abuses power, I said King George, kings, queens and mayors. When I said mayor, they started talking, which there was a cut in the film, but there isn't a cut in the tape that I gave to the Jewish Relations Council. They started talking and . . . .
>
> \*  \*  \*  \*  \*  \*
>
> [Question]: You mentioned a cut in the tape. Are you saying that the piece as it was portrayed on television, as running smoothly in one solid quote, did not occur that way?
>
> [Heath]: That's right. It did not. . . . What happened was we were talking about

the abuse of power, as I had mentioned, and everything else. I said kings, queens, and mayors. Before that, I said I had even used my police powers coming down there that day because I was speeding. I said people abuse power, kings, queens and mayors.

> When I said mayors, somebody mentioned Mayor Goldsmith sold out the Hoosier Dome and people said different things. I said, "Wait a minute. We're getting off track." They said, "Well, what do you guys call him?" I said, "Well, I shouldn't say." Then I said, "Oh, well, we call him Goldstein."
>
> [Question]: Now, stop there. The questions that came from the audience and the comments about Mayor Goldsmith do not appear on that tape; is that correct?
>
> [Heath]: Right.
>
> [Question]: And it was due to a question from the audience that you were asked what do you guys, law enforcement officers of Indianapolis, call the Mayor; is that right?
>
> [Heath]: Right.

Merit Board Transcript at 43–44.

Although the Merit Board made no express finding regarding whether the comment in question came about as Heath explained, Heath's version was not disputed by the City. Accepting Heath's version as true, the comment in question was made during a public meeting in the midst of a discussion about the fiscal policies of the Mayor of City of Indianapolis. As such, it can hardly be disputed that the comment addressed a matter of political concern to the community. Inasmuch as speech about political matters is at the core of the free speech guarantee under both the Indiana and United States Constitutions, Heath's comments satisfy the first inquiry under the *Connick* analysis because they addressed a matter of public concern.[2]

---

**2.** The Sixth Circuit panel in *Dambrot v. Central Mich. Univ.,* 55 F.3d 1177, 1188 found the following test "useful" for determining whether the speech in question was about a matter of public interest:

[O]ne way to evaluate the possibility of the "public concern" component in questioned speech is to imagine it being discussed in public. The political compulsion of public employees partially at issue in *Connick, supra,* the allegation of corruption noted in [*McMurphy v.*

■ Having concluded that Heath's speech addressed a matter of public concern, we proceed to the second step, *i.e.,* an inquiry into the adequacy of the investigation conducted by the City.

It appears that Chief Toler made the decision to discipline Heath after viewing the tape that was broadcast on WTHR–TV's 5:00 p.m. evening news program on May 3. The 11:00 newscast on May 3 on WTHR–TV included a segment in which Chief Toler was shown viewing the segment that had been aired on the 5:00 newscast. After viewing the tape, Chief Toler commented, "Sergeant Heath definitely has the right to freedom of speech. I don't agree with what he said, but we will make an investigation." Merit Board Transcript at 57. Heath attempted to speak with Chief Toler on May 4, the day after the newscast, but was unable to do so. Heath finally met with Chief Toler on the morning of May 5, and the following exchange occurred:

> Toler: After reviewing this matter, I've decided to suspend you for thirty days and demote you to patrolman.
>
> Heath: Wait a minute. Don't you want to hear the truth of what happened?
>
> Toler: No. This isn't the place for that. If you want to have your side heard, you file an appeal.

*Id.* at 58. Later during the same meeting, Heath asked Toler if he had reviewed the entire tape of Heath's comments, not just the edited version that had been telecast by WTHR–TV. Toler responded that he had not because WTHR–TV had refused his request to make those tapes available for his viewing.

In view of Toler's admitted knowledge that Heath's constitutional right to freedom of speech was implicated, we conclude the investigation undertaken by the Chief to verify the existence of grounds for discipline was inadequate. While the precise nature of Chief Toler's investigation is not apparent from the record, we can discern at least that Chief Toler did not ascertain whether the comments were presented in the proper context. In view of his admitted knowledge that there was a substantial likelihood that Officer Heath's comments were protected, Chief Toler's investigation cannot be characterized as "tread[ing] with a certain amount of care." *Waters v. Churchill,* 511 U.S. at 677, 114 S.Ct. at 1889. However, the Merit Board considered Heath's explanation of the context in which the remarks were made, and considered as well documentary evidence and the testimony of other witnesses. Therefore, wef Toler's investigation was inadequate, the hearing before the Merit Board complied with the *Waters* requirement regarding the investigation.

■ The third test under *Connick* requires a balancing of the interests of Heath, as a citizen, in commenting upon matters of public concern, and the IPD's interest, as an employer, in running an efficient operation.

■ It is well established that the government as employer possesses far broader powers than it does as sovereign in regulating the speech of its employees. *Waters,* 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686. This principle developed because

> the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch.

*Connick v. Myers,* 461 U.S. at 151, 103 S.Ct. at 1692.

■ We are mindful that police officers "are not relegated to a watered-down version of constitutional rights." *Garrity v. New Jersey,* 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967). However, contrary to Heath's contention, the fact that he is a police officer is relevant in our analysis. In the instant case, it was not the point of view expressed by Heath that gave rise to the sanctions, it was the manner in which the view was expressed. This distinction, we are

City of Flushing, 802 F.2d 191 (6th Cir.1986)], and comments concerning the level of fire protection in a town discussed in *Brasslett v. Cota,* 761 F.2d 827 (1st Cir.1985), all can easily be envisioned as the subjects of heated disputation, with the contesting points of view hashing it out from soapboxes in the public square.

convinced, is significant. In this regard, we disagree with Heath's assertion that it is not relevant whether the comment in question was anti-Semitic. *See, e.g., Scruggs v. Keen,* 900 F.Supp. 821 (W.D.Va.1995) (noting that use of racial slur is perhaps not entitled to First Amendment protection).

In *Anderson v. Evans,* 660 F.2d 153 (6th Cir.1981), the court reviewed a case in which a teacher was alleged to have said to the principal of the school in which she worked: "I hate all black folks." *Id.* at 155. The teacher denied making the statement but eventually was dismissed because of the statement and because of a finding of sub-standard classroom performance.

The Sixth Circuit affirmed the dismissal for the following reasons: (1) the remark created tension between the teacher and the principal, making it difficult for them to maintain a normal relationship in a situation in which cooperation between the two was necessary; (2) there was evidence that the remark had a detrimental effect in the school and the community which it served; (3) there was evidence that the teacher's effectiveness as a teacher was negatively affected by the attitude reflected in the comment; and (4) the nature of the remark cast serious doubt on the teacher's judgment and general competence as a teacher. Although the afore-mentioned considerations by the *Anderson* court do not reflect an established set of criteria to be applied in every situation, they prove useful in the instant case.

There is no evidence that Heath's remarks created a strain in the working relationship between him and Chief Toler. Moreover, in a large police department such as the IPD, it is doubtful that such would be a major consideration. At the hearing, fellow police officers Kenneth Smith and Patricia Young testified on Heath's behalf, while no one was presented by the City to testify regarding any negative impact on Heath's relationship with his peers.

There was, however, evidence that Heath's comments had a detrimental effect in the community, especially the Jewish community of Indianapolis. Michael Maurer, an Indianapolis businessman who is Jewish, spoke at the Merit Board hearing as a member of the Jewish Community Relations Council (JCRC). Maurer explained that the JCRC

> is an agency that has representatives of all the other Jewish agencies throughout the entire community and through that representation, the Jewish Community Relations Council, when it has a clear consensus, relates to the rest of the community on behalf of the Jewish community.

Merit Board Transcript at 18. According to Maurer, with regard to the Jewish community of Indianapolis, "[t]he comment destroyed the respect—the mutual respect that should occur between the citizens and law enforcement." *Id.* at 24. Although several members of the Jewish Community spoke on Heath's behalf at the hearing, the Merit Board obviously gave greater weight to Maurer's assertion, which was within its province. Therefore, there was credible evidence that Heath's comments offended the subject ethnic group in the Indianapolis community, thus supporting the conclusion that the comments had a detrimental effect on the community.[3]

Finally, even accepting Heath's representation that the comments in question were not intended as a religious or racial slur, the record supports the conclusion that the comments reflect a lack of judgment on Heath's part. In view of the fact that Officer Heath's duties as a police sergeant included supervisory duties, the lack of judgment evinced by the remarks was a legitimate concern on the part of the Merit Board.

In summary, while we concede Officer Heath's right to make the remarks in question, the likely effect of the remarks on the Indianapolis Jewish community were, or should have been, obvious. Heath himself evinced knowledge of the potentially inflam-

---

**3.** The instant case is distinguishable from *Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), in which the sanction was disapproved because the plaintiff did not have to work closely with the targets of his public criticism. The nature of Officer Heath's job required contact with all segments of the public, including members of the Jewish community of Indianapolis.

matory nature of the remark by prefacing it with the comment, "I better not say it, ah well...." *Record* at 9. This occurred while Heath was delivering, in his words, "an official talk ... as a police officer", Merit Board Transcript at 68, in a public place while dressed in his police uniform. In view of the difficult and critical role played by the Indianapolis Police Department in the local community, and the importance of fostering confidence in and trust of that agency among members of the community, we conclude that the interest of the City of Indianapolis, specifically the IPD,[4] outweighed the interests of Officer Heath under the *Connick* balancing test.

In this regard, we have previously acknowledged the nature and importance of the IPD's interest in restricting its officers from making racially derogatory comments:

> We may take judicial notice that the police department of a large metropolitan area such as Indianapolis, where this court sits, will employ an appreciable number of minority employees; as importantly, such a city will be the home of an appreciable number of minority residents. The important functions of a police department are clearly not fostered, and are indeed impaired, by groundless public assertions that would tend to erode the confidence that a considerable segment of a population has in its police department.

*Highbaugh v. Consolidated City of Indianapolis,* 441 N.E.2d 501, 505 (Ind.Ct.App. 1982). Therefore, the City had an interest in limiting Officer Heath's freedom of expression which it could not have claimed with respect to members of the public at large. The decision of the Marion Superior Court is reversed and the decision of the Merit Board is reinstated.

Judgment reversed.

ROBERTSON, J., concurs.

SULLIVAN, J., concurs with separate opinion.

SULLIVAN, Judge, concurring.

The Board was entitled to reach the factual conclusion that the statement was made not in the context of frugality with city funds but was made in the context of corruption and abuse of power. Also, even if focusing upon fiscal responsibility, the remark was inextricably tied to the Mayor's Jewish heritage. In the context of the remark made, the clearly intentional misstatement of the Mayor's surname could only be viewed as derogatory. Furthermore, in broaching the subject of corruption and abuse of power and specifically referring to the Mayor in relation thereto, Heath had substantially deviated from any laudatory and beneficial caste to his overall talk to the Patriots. He was no longer speaking of police reaching out to the community nor was he encouraging community respect for law enforcement. Quite to the contrary, the remark, though perhaps isolated in context, was unmistakable in its encouragement of disrespect for the chief executive of the city which the Department serves, and therefore demeaning to the Department itself and its attempt to breed respect within the community.

From the evidence, the Board was within its discretion in concluding that as a factual matter, the remark was "demeaning to the uniform and the Department" and therefore a violation of Section VI—Conduct Unbecoming an Officer.

4. As stated by the Supreme Court in *Waters:*

> Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible. When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her. The reason the

governor may ... fire [a] deputy [for uninhibitedly and robustly criticizing the governor's legislative program] is not that this dismissal would somehow be narrowly tailored to a compelling government interest. It is that the governor and the governor's staff have a job to do, and the governor justifiably feels that a quieter subordinate would allow them to do this job more effectively.

*Waters,* 511 U.S. at 675, 114 S.Ct. at 1887–88.