**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-3509
_____

NATALIE MUNROE,

Appellant

v.

CENTRAL BUCKS SCHOOL DISTRICT;
N. ROBERT LAWS, Superintendent of Schools Central
Bucks School District; ABRAM LUCABAUGH,
Principal Central Bucks High School East
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 2-12-cv-03546)
District Judge: Honorable Cynthia M. Rufe
_____

Argued June 8, 2015

BEFORE: AMBRO and COWEN, <u>Circuit Judges</u>
RESTANI*, <u>Judge</u>

(Filed: September 4, 2015)

Stanley B. Cheiken, Esq. (Argued)
Suite 400
101 Greenwood Avenue
Jenkintown, PA 19046

      Counsel for Appellant

Kimberly A. Boyer-Cohen, Esq. (Argued)
Marshall, Dennehey, Warner, Coleman & Goggin
2000 Market Street
Suite 2300
Philadelphia, PA 19103

      Counsel for Appellee

Sean A. Fields, Esq.
Pennsylvania School Boards Association
400 Bent Creek Boulevard
P.O. Box 2042
Mechanicsburg, PA 17055

      Counsel for Amicus Appellee Pennsylvania School
      Board Association

2

_____

\* Honorable Jane A. Restani, Judge for the United States
Court of International Trade, sitting by designation.

_____

## OPINION OF THE COURT

_____

COWEN, <u>Circuit Judge</u>.

Plaintiff Natalie Munroe filed this First Amendment retaliation action against Defendants Central Bucks School District ("School District"), School District Superintendent N. Robert Laws, and Central Bucks East High School ("CB East") Principal Abram Lucabaugh. The School District fired Munroe, an English teacher at CB East, after her blog—in which she made a number of derogatory comments about her own students—was discovered. She appeals from the order of the United States District Court for the Eastern District of Pennsylvania granting the Defendants' summary judgment motion. We agree with the District Court that, pursuant to the <u>Pickering</u> balancing test, Munroe's speech did not rise to the level of constitutionally protected expression. Accordingly, we will affirm.

I.

In 2006, Munroe was hired by the School District and assigned to teach English at CB East in Doylestown, Pennsylvania. Her performance evaluations indicated that she was generally considered to be an effective and competent teacher. For example, an October 2006 review praised her abilities and work habits. In June 2008, Lucabaugh wrote a letter of recommendation in support of Munroe's application for admission to a graduate program. He described Munroe as a "woman of utmost integrity, character, and intelligence," "a consummate educator with a sparkling future," and "a woman whom I respect both personally and professionally." (A175.) The School District granted Munroe tenure in March 2010.

In August 2009, Munroe began a blog entitled <u>Where are we going, and why are we in this handbasket?</u> Blogging under the name "Natalie M," she did not expressly identify either where she worked or lived, the name of the school where she taught, or the names of her students. According to Munroe, her blog was meant to be viewed by friends that she had asked to subscribe. She did not intend for it to be read by the public at large. For most of the blog's history, there were no more than nine subscribed readers, including Munroe herself and her husband. However, no password was required to access the blog.

Munroe wrote a total of eighty-four blog posts between August 2009 and November 2010, "most of which had nothing to do with her school or work." (Appellant's Brief at 6 (citing A208-A254, A412-A452).) Intended as a vehicle to keep in touch with friends, Munroe mostly

addressed personal matters like her food and film preferences, her children, and her regular yoga classes.  On a number of occasions, she wrote about her co-workers, the School District administration, her students, and their parents.

In what the District Court called "one memorable passage," <u>Munroe v. Cent. Bucks Sch. Dist.</u>, 34 F. Supp. 3d 532, 538 (E.D. Pa. 2014), Munroe explained that she was entering grades, discussed the grading process, and, finally, offered some comments she would like to see added to the so-called "canned" comment list used to fill out students' report cards.  At the top of this January 20, 2010 blog post, there was a depiction of a school bus with a "Short Bus" sign and the following heading:  "**I DON'T CARE IF YOU LICK THE WINDOWS, TAKE THE SPECIAL BUS OR OCCASSIONALLY PEE ON YOURSELF … YOU HANG IN THERE SUNSHINE, YOU'RE FRIGGIN SPECIAL.**" (A245).  Munroe then stated the following:

> I'm being a renegade right now, living on the edge and, um, blogging AT work.
>
> However, as I'm blogging *about* work stuff, I give myself a free pass of conscience.
>
> I'm in the process of entering grades, and also need to enter comments for the grades.  I used to take a lot of time with this procedure, choosing just the right comment(s) for my students.  If I put a negative one, I'd also put a positive one to temper it.  (When I was in

5

school, I hated when I got the same 2 or 3 comments from my teachers. It felt so insincere.)

(For the record, my computer froze and had to be shut down at work; when I rebooted, I didn't bother signing back on to finish this as other things to do came up. At present, then, I'm not being a renegade at all, as I'm writing this at my kitchen table.)

Anyway, as I was saying, when I was first teaching, I put a lot of time and effort into the comments because I felt it was a great way to communicate the students' efforts. Then it got to be a complete pain in the ass, just one more thing standing between me and being done the report cards, and suddenly I realized why I'd always gotten the same comments from my teachers: they didn't want to do them any more than I do. (I refuse to believe the alternative reason that I'll explore momentarily.)

Also, as the kids get worse and worse, I find that the canned comments don't accurately express my true sentiments about them. So now I pretty much choose "Cooperative in Class" for every kid (or, in some instances, will speak in other codes. For instance, if they talk a lot, I'll put "is easily distracted" or "talks persistently"; if it's a kid that has no personality, I'll put

6

"ability to work independently"). For some kids, though my scornful feelings reach such fever pitch that I have a hard time even putting "cooperative in class" and have, sadly, had some kids for which none of the comments fit. (Again, this was NOT me. It couldn't have been. I was a delight!!)

Thus, for this blog, I will list the comments I'd like to see added to the canned comment list, as an accurate reflection of what we really want to say to these parents. Here they are, in no particular order:

- Concerned your kid is automaton, as she just sits there emotionless for an entire 90 minutes, staring into the abyss, never volunteering to speak or do anything.
- Seems smarter than she actually is.
- Has a massive chip on her shoulder.
- Too smart for her own good and refuses to play the school 'game' such that she'll never live up to her true potential here.
- Has no business being in Honors.
- A complete and utter jerk in all ways. Although academically ok, your child has no other redeeming qualities.
- Lazy.
- Shy isn't cute in 11th grade; it's annoying. Must learn to advocate for himself instead of having Mommy do it.

- One of the few students I can abide this semester!
- Two words come to mind: brown AND nose.
- Dunderhead.
- Complainer.
- Gimme an A.I.R.H.E.A.D. What's that spell? Your kid!
- There is such a thing as too loud in oral presentations. We shouldn't need earplugs.
- Att-i-tude!
- Nowhere near as good as her sibling. Are you sure they're related?
- I won't even remember her name next semester if I see her in the hall.
- Asked too many questions and took too long to ask them. The bell means it's time to leave!
- Has no business being in Academic.
- Rat-like.
- Lazy asshole.
- Just as bad as his sibling. Don't you know how to raise kids?
- Sneaking, complaining, jerkoff.
- Frightfully dim.
- Dresses like a street walker.
- Whiny, simpering grade-grubber with an unrealistically high perception of own ability level.
- One of the most annoying students I've had the displeasure of being locked in a room with for an extended time.

8

- Rude, belligerent, argumentative fuck.
- Tactless.
- Weirdest kid I've ever met.
- Am concerned that your kid is going to come in one day and open fire on the school. (Wish I was kidding.)
- I didn't realize one person could have this many problems.
- Your daughter is royalty. (The Queen of Drama)
- Liar and cheater.
- Unable to think for himself.
- I hear the trash company is hiring . . .
- Utterly loathsome in all imaginable ways.
- I called out sick a couple of days just to avoid your son.
- There's no other way to say this: I hate your kid.

These comments, I think, would serve me well when filling out the cards. Only, I don't think parents want to hear these truths.

Thus the old adage ... if you don't have anything nice to say ...

... say "cooperative in class."

(A245-A246.)

9

On April 3, 2010, Munroe blogged about all of the "Things From This Day That Bothered Me." These "Things" were almost all work-related:

Things From This Day That Bothered Me

1. The fact that it was 85 degrees in my classroom because the district insists on controlling the temperature from central admin and won't turn on the AC until May 15th, even though people are sweltering NOW.

2. The fact that I called home about an obnoxious kid in class last week before break and his mom said they told him to "knock it off" (the obnoxious behavior), yet the FIRST thing he said to me when he saw me today was, "Yeah, Ms. M. I give you credit for tryin' to ruin my weekend. But the boys rallied up and had a banger anyway!" Clearly, the talk with his mom was quite effective.

3. The fact that several students in 3rd block did a lame job on their easy assignment today.

4. The fact that the jerk who was out 3 days around our last major assessment because his family took him on trip to Puerto Rico and then emailed me all of this nonsense about how he shouldn't have to take the test on time because he was "excused" for those days, was out again

today (the date of another assessment) because his family took him to the effing Master's golf shit over Easter break. Can someone please tell me why Thursday-Wednesday wasn't enough time off to do what had to be done such that he could come back today when he KNEW there was an assessment??? It's good that people value school so much—wait, no, they don't.

5. The new chick who seems to be on or near my elliptical all the damn time.

(A213.) In this same blog post, Munroe listed "Artists Who Annoy the Crap Outta Me and Who I Must Turn Off as Soon as I Hear the Opening Bars to Their Songs, But Who Are Regarded as 'Talent' by Some People" (i.e., Alicia Keys, Beyonce and Destiny's Child, and Miley Cyrus) as well as "Things I Liked About This Day." (Id.) None of the "Things I Liked About This Day" were related to her job or her students. Rather, these "Things" focused mostly on her daughter.

Discussing recent disciplinary issues and other problems (for instance, she had to deal with a student and his mother complaining about a test score), Munroe asked on October 27, 2009:

Kids! I don't know what's wrong with these kids today! Kids! Who can understand anything they say? They are disobedient, disrespectful oafs. Noisy, crazy, sloppy, lazy

11

LOAFERS (and while we're on the subject) Kids! You can talk and talk till your face is blue. Kids! But they still do just what they want to do. Why can't they be like we were? (Perfect in every way!!!) What's the matter with kids today????? My students are out of control. They are rude, disengaged, lazy whiners. They curse, discuss drugs, talk back, argue for grades, complain about everything, fancy themselves entitled to whatever they desire, and are just generally annoying. . . .

(A440.)[1]

In another blog post dated January 11, 2010, Munroe explained why she believed that "this new-aged soft-on-crime/bribery and overindulgence is probably the reason that kids are so horrible today." (A249.) According to Munroe, "teenagers are complete asses" who have no respect for adults, for authority, or for teachers. (Id.) "Parents won't allow anyone but themselves to discipline their kids, but THEY don't do any disciplining either." (Id.) Teenagers then talk back in school and "think it's appropriate to try to go into my desk to retrieve a hackey-sack that was confiscated during use in class." (Id.) Comparing how parents treat their children today with how she was raised, Munroe complained that parents were "breeding a disgusting brood of insolent, unappreciative, selfish brats." (A250.)

---

[1] According to her deposition testimony, Munroe was quoting a song from Bye Bye Birdie.

12

Noting that "it's paper grading time again," Munroe observed in an April 17, 2010 blog post that "these times are getting worse and worse." (A416.) "The first semester of this school year, when I had a parade of whiny, entitled kids run to the guidance department to tell on me for giving them the low grades they earned on their shoddy papers, sort of scarred me. I consider myself very fair with my grading." (Id.)

There were also blog posts that addressed the concepts of honor and academic integrity as well as Munroe's concerns about student work habits and her negative attitude towards her job and her students. Munroe blogged (in a March 13, 2010 post) about her frustrating attempt to teach her students how to write a "Literary Analysis Paper" (describing, for instance, how, when she met with students to talk about their thesis statements, "I found that many of them didn't bother even attempting to revise their statements, instead coming to the 'conference' expecting me to tell them exactly what the problem was and how to fix it (and, all the better, to write it for them if I was willing . . . )," and how "one boy" said that he would ask his mother to look at the paper over the weekend). (A222.) Munroe lamented that "I teach and teach and teach, but no learning seems to happen." (A223.) "I work my ass off to help them achieve success, but the only one learning how to write a better paper is me. Like I said, I'm tired of the dance. I just want to sit this one out." (Id.) On January 23, 2010, she likewise claimed that, with each passing day, "I'm coming to, more and more, realize that I need all the blessings I can get" because "[t]hese kids are the devil's spawn." (A237.) She then discussed in some detail the importance of honor, how she addressed this concept in

13

class (and the often hostile reaction on the part of some students), and, among other things, the fact that "TWO days after my lofty speeches, and a single day after they all signed the [honesty] pledge and pledge wall . . . someone [described as "'that girl in the back in pink'"] had consciously made a cheat sheet and brought it in and intended to cheat."[2] (A240.)

The School District administration first learned of Munroe's blog in February 2011 when a reporter from The Intelligencer (a local newspaper) began to ask questions about the blog. Specifically, the reporter e-mailed Laws on February 8, 2011, asking if he was "aware of this blog, which the students apparently have been circulating on facebook and through other social media." (A258.) On February 9, 2011, Lucabaugh met with Munroe, confronted her with printed copies of her blog posts, and placed her on immediate paid suspension. At this point in time, the School District had no regulation specifically prohibiting a teacher from blogging on his or her own time (although it appears that a policy was subsequently adopted by the School District).

In his deposition testimony, Lucabaugh described the fevered reactions on the part of students and their parents to Munroe's blog posts: "Kids were furious. They were livid. The calls that were coming in from parents, the e-mails that were coming in, kids had copies of it and they were distributing it in the halls." (A397.) The principal

---

[2] Munroe also referred to a co-worker named "Bill" as "a douche." (A210.) She similarly claimed that the School District administration harassed a colleague until he resigned because it believed he was an ineffective teacher.

14

characterized CB East as "like a ticking time bomb" and asserted that the environment "was so incendiary" that the administration "thought we're going to have a riot or a sit-in or worse." (A398.) "To say it was a disruption to the learning environment is an understatement." (Id.) According to Lucabaugh, Munroe was escorted from the building for her own safety.

In what he described as an unprecedented situation, Lucabaugh began receiving e-mails from parents indicating that they did not want Munroe to teach their children. He continued to receive more and more e-mails throughout the summer, peaking in June and July of 2011. He asked his superiors: "'What do I do with this?' 'Because I have to schedule the building and we have to get ready for class and I can't not put them in class. So what do I do with this'. I said – first of all, I have – now I'm talking over seventy-five, eighty people, ninety people, one hundred people, a hundred and—and it was growing." (A399.) It appears undisputed that the School District ultimately received over 200 "opt-out" requests from parents. While he recognized that it was the school board that had to decide how to handle these requests, Lucabaugh indicated that Munroe would probably not "have a chance" to teach in a "toxic environment" if "I already know that twenty-five students and their parents don't want their child in her class and they're in her class." (A400.) Accordingly, the decision was made to hire another teacher and have her "shadow" Munroe, i.e., teach the same exact schedule. Munroe claims that, "[i]n August 2011, Defendants [in retaliation for Munroe's expression] informed residents of the School District that they would honor all requests of

15

students to 'opt out' of Munroe's classes." (Appellant's Brief at 10 (citing A105-A111).) According to Munroe, the School District "said it [allowed the opt-outs] in case students were uncomfortable returning to the classroom of a teacher who would say such things about them on her private blog." (A108.) She did not believe the School District's justification because it was unprecedented to allow students to opt out of a class. The real reason was because "they didn't want me to have any students to teach." (A111.) However, Munroe acknowledged that the whole situation was probably unprecedented.

The story was picked up by a widely-read internet news site, The Huffington Post, in a posting entitled "Natalie Munroe, Central Bucks Teacher, Suspended for Dissing Students On Blog." (A260.) Lucabaugh made a statement to the media. Munroe herself appeared on ABC, CBS, NBC, CNN, Fox News, and other television stations. She also gave interviews to several print news sources, including the Associated Press, Reuters, Time Magazine, and the Philadelphia Inquirer.

According to The Huffington Post, "Laws says the posts should result in termination but the district is still investigating." (Id.) In two e-mails, Laws expressed a desire to terminate Munroe's employment. In his February 11, 2011 e-mail, he indicated that one of the School District's

"constitutional lawyers" was researching the matter.[3] (A262.) On February 17, 2011, he noted that, "[f]or the legal team, we still need to confirm a plan for termination." (A266.) In a third e-mail dated February 24, 2011, Laws asked if Munroe's teaching certificate could be revoked, which "would, in effect, be a potentially less costly approach and, in effect, net the same result as a termination." (A268.)

In any event, Munroe went out on maternity leave, which had already been scheduled before the blog was discovered. Her leave ran from March 1, 2011 until the end of the 2010-2011 school year. On June 15, 2011, Lucabaugh completed Munroe's evaluation, concluding that her performance for the preceding academic term was unsatisfactory. The evaluation purportedly relied on a number of different grounds for this negative rating, including ineffective instructional delivery practices and inappropriate use of a "nanny cam" during teaching hours. However, it also observed that, in her blog posts, Munroe demonstrated "inappropriate or disrespectful interactions between teacher and students" and a "lack of knowledge of the Professional Code of Conduct." (A271-A272.) In particular, it was noted that Munroe failed to use acceptable and professional

---

[3] Noting that Munroe was scheduled to appear on a Fox News show ("Justice with Judge Jeanine"), Laws expressed surprise that people were supporting Munroe: "I feel like I am in the twilight zone. I can't believe people support this woman and her right to 'say anything.'" (A262.) In a subsequent e-mail, a school board member stated that "[a]fter seeing her on the Fox news show I am confident we are doing the right thing." (A264.)

language and that her comments did not reflect sensitivity to the fundamental human rights of dignity, privacy, and respect. As a result, students and parents "expressed shock and outrage that their teacher would write about them in such derogatory terms and that their identity was not protected by the details provided in her blog which was placed on the internet to be accessed by anyone." (Id.) "Students and parents stated verbally and in writing that they would not return to this teacher's class because of what she had written in her blog," and students indicated that they lacked confidence in this teacher on account of "the breach in the student-teacher relationship." (Id.) In the summer of 2011, Laws submitted an "Educator Misconduct Complaint" to the Office of Chief Counsel of the Pennsylvania Department of Education, alleging that Munroe engaged in "[c]onduct inappropriate for an Educator." (A277.) The complaint was dismissed on the grounds of legal insufficiency. In addition, the School District denied Munroe's request for a transfer to another school.

Munroe returned to work in August 2011. The School District held a media briefing to announce her return. In a prepared statement, Lucabaugh explained that, "[w]hile her actions have created an unfortunate and incredibly difficult situation, Mrs. Munroe maintains employee rights, and that is the sole reason for her return." (A285.) According to the principal of CB East:

> Whether or not Mrs. Munroe had the legal right
> to express her views with such vitriol is not the
> heart of this issue. No one here is contending

18

that she can't say these things ... legally. And for that reason, she has a <u>legal</u> right to return.

What <u>is</u> at the heart of this issue, however, is the large-scale disruption her comments created, and the ensuing damage they have caused the young men and women to whom she was alluding. Natalie Munroe's actions placed the outstanding work that occurs in our school in question, placed my leadership in question, placed our students' merit in the crosshairs of national scrutiny, breached trust with the community, and compromised her professional integrity. Her comments were unprofessional, disrespectful, and disturbing, particularly coming from the heart of an educator. Moreover, and most importantly, they were crass and CRUEL.

The obvious question left unanswered as the school year ended was whether or not Mrs. Munroe would be returning to teach in the fall. I should point out here that her maternity leave ends this month, and regardless of the moral and ethical issues surrounding her actions, Mrs. Munroe maintains employment rights.

. . . .

19

Despite the fact that Mrs. Munroe retains legal employment rights, I would hope none of us lose sight of the real issue.

The real issue is that while something may be legally right, it may not be ethically or morally right. There are consequences that occur when a person chooses to exercise her rights and say outrageous, disrespectful, vulgar and cruel things about other people ... especially when it's a teacher saying terrible things about the young men and women who are in her classroom.

As a public school, we are charged with meeting the needs of every student who enters our doors, rich or poor, gifted or learning disabled, troubled or triumphant, and guiding them to their full potential so they receive the most precious gift an education can provide: opportunity for choice in life.

What pains me the most in all of this is how the statements made by Mrs. Munroe have placed our students in the line of fire, and caused a nation to question their collective merit.

(A286-A288.)

Munroe received negative performance evaluations over the course of the 2011-2012 school year (which, unlike the evaluation she received at the end of the previous school

20

year, did not expressly reference her blog and its effects), and she was required to complete detailed lesson plans (which she claimed were deliberately engineered to be too complicated to finish accurately). On June 1, 2012, the School District notified Munroe of its intention to terminate her employment based on charges of failure to meet requirements set forth in performance improvement plans, incompetency, unsatisfactory classroom management, unsatisfactory delivery of instruction, and unsatisfactory lesson planning. On June 26, 2012, the School District formally terminated her employment.

Munroe filed this action under 42 U.S.C. § 1983, alleging that Defendants violated her First Amendment rights. "Specifically, Munroe claims that the school administration harassed and eventually terminated her after discovering a private blog in which Munroe has expressed criticism of the school, her co-workers, and her students." Munroe, 34 F. Supp. 3d at 533. The parties completed discovery, and Defendants moved for summary judgment. In a July 25, 2014 order, the District Court granted their motion and entered summary judgment in favor of Defendants and against Munroe.

In its opinion, the District Court ultimately concluded that Defendants did not violate Munroe's constitutional right to free expression. "Because this Court has determined as a matter of law that Plaintiff's comments do not merit protection under the balancing test established by [Pickering v. Board of Education, 391 U.S. 563 (1968)]," it believed it was unnecessary to reach the question of whether this speech

directly caused her termination.  Munroe, 34 F. Supp. 3d at 540-41.  While it recognized that freedom of speech constitutes an indispensable condition of nearly every other right or liberty, see Palko v. Connecticut, 302 U.S. 319, 327 (1937) (characterizing freedom of thought and speech as "the matrix, the indispensable condition, of nearly every other form of freedom"), overruled on other grounds, Benton v. Maryland, 395 U.S. 784 (1969), the District Court pointed out that education "is one of the most heavily protected interests in modern American jurisprudence," Munroe, 34 F. Supp. 3d at 541 (citing Brown v. Bd. of Educ., 347 U.S. 483, 493 (1954)).  "In this case, Plaintiff's speech, in both effect and tone, was sufficiently disruptive so as to diminish any legitimate interest in its expression, and thus her expression was not protected."  Id.

## II.

"[A] State may not discharge an employee on a basis that infringes that employee's constitutionally protected

22

interest in freedom of speech."[4] <u>Rankin v. McPherson</u>, 483 U.S. 378, 383 (1987). Free and unhindered debate on matters of public importance constitutes a core value of the First Amendment. <u>See, e.g.</u>, <u>Pickering</u>, 391 U.S. at 573. Accordingly, public employees do not surrender all of their First Amendment rights merely because of their employment status. <u>See, e.g.</u>, <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 417 (2006).

Nevertheless, "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." <u>Pickering</u>, 391 U.S. at 568. In short, "the government as employer" possesses "far

---

[4] The District Court possessed subject matter jurisdiction pursuant to 28 U.S.C. § 1331. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291 and exercise plenary review over a district court order granting a motion for summary judgment, <u>see, e.g.</u>, <u>Monaco v. Am. Gen. Assurance Co.</u>, 359 F.3d 296, 299 (3d Cir. 2004). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The facts must be viewed in the light most favorable to the non-moving party. <u>See, e.g.</u>, <u>Hugh v. Butler Cnty. Family YMCA</u>, 418 F.3d 265, 267 (3d Cir. 2005).

We note that the Pennsylvania School Boards Association ("PSBA") has filed an amicus brief in support of Defendants.

23

broader powers than does the government as sovereign." Waters v. Churchill, 511 U.S. 661, 671 (1994) (plurality opinion). "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." Garcetti, 547 U.S. at 418. Government employers, like their private counterparts, still "need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." Id.. As we explained in Miller v. Clinton County, 544 F.3d 542 (3d Cir. 2008), "public employers are still employers, and they therefore have the same concern for efficiency and the need to review and evaluate employees as any other employer in order to ensure that the actions of employees do not interfere with the performance of public functions," id. at 547; see also, e.g., Dougherty v. Sch. Dist. of Philadelphia, 772 F.3d 979, 987 (3d Cir. 2014) ("At the same time, the Supreme Court also aptly recognizes the government's countervailing interest—as an employer—in maintaining control over their employees' words and actions for the proper performance of the workplace."). A public employer accordingly may impose speech restrictions that are necessary for efficient and effective operations. See, e.g., Dougherty, 772 F.3d at 987 ("Thus, '[s]o long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively. [Garcetti, 547 U.S. at 419].").

"To establish a First Amendment retaliation claim, a public employee must show that (1) his speech is protected by the First Amendment and (2) the speech was a substantial or

motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to the employer to prove that (3) the same action would have been taken even if the speech had not occurred." Id. at 986. In order for his or her speech to rise to the level of constitutionally protected expression, the employee must speak as a citizen (and not as an employee), "the speech must involve a matter of public concern," and "the government must lack an 'adequate justification' for treating the employee differently than the general public based on its needs as an employer under the Pickering balancing test." Id. at 987 (quoting Gorum v. Sessoms, 561 F.3d 179, 185 (3d Cir. 2009)). The Pickering balancing test requires the courts to "'balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" Id. at 991 (quoting Pickering, 391 U.S. at 568). We must also consider, on the employee's side, the interest of the public in the speech at issue. Id. The question of whether or not speech is protected by the First Amendment constitutes a question of law. See, e.g., Miller, 544 F.3d at 548; Hill v. Borough of Kutztown, 455 F.3d 225, 241 (3d Cir. 2006).

Defendants ask this Court to affirm the District Court's order on four different grounds: (1) Munroe's speech, in light of its content, form, and context, did not implicate a matter of public concern; (2) her speech was likely to cause—and, in fact, did cause—disruption "to the rendering of educational services by the District," and the Pickering balancing test accordingly "weighed in favor of Defendants and would not

25

have prevented them from taking adverse action against Plaintiff based upon her speech" (Appellees' Brief at 22); (3) Munroe's speech did not constitute a substantial factor in the various negative performance evaluations she received or in her eventual termination; and (4) the School District would have pursued the same course of action even in the absence of any protected activity. We assume that Munroe's speech satisfied the "public concern" requirement. However, we conclude that her speech was likely to cause—and, in fact, did cause—disruption and that, under the circumstances, the School District's interest outweighed Munroe's interest, as well as the interest of the public, in her speech. Because her speech was not constitutionally protected, we (like the District Court) need not, and do not, reach Defendants' causation arguments.

## A.     The "Public Concern" Requirement

The Supreme Court has explained that speech implicates a matter of public concern when "it can 'be fairly considered as relating to any matter of political, social or other concern to the community,' [Connick v. Myers, 461 U.S. 138, 146 (1983)], or when 'it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public,' [City of San Diego v. Roe, 543 U.S. 77, 83-84 (2004) (per curiam)]." Snyder v. Phelps, 562 U.S. 443, 453 (2011). Defendants acknowledge that, "[b]ecause of the nature of their employment, speech by public employees is deemed to be speech about public concern when it relates to their employment" so long as it is not speech upon matters of purely personal interest.

26

(Appellees' Brief at 30.) Accordingly, speech that relates solely to mundane employment grievances does not implicate a matter of public concern. See, e.g., Sanguigni v. Pittsburgh Bd. of Pub. Educ., 968 F.2d 393, 399 (3d Cir. 1992). In determining whether the speech at issue satisfies this element, courts should take into account the employee's motivation as well as whether it is important to our system of self-government that the expression take place. See, e.g., Azzaro v. Cnty. of Allegheny, 110 F.3d 968, 978 (3d Cir. 1997) (en banc); Versage v. Twp. of Clinton, 984 F.2d 1359, 1364-65 (3d Cir. 1993). "The arguably 'inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.'" Snyder, 562 U.S. at 453 (quoting Rankin, 483 U.S. at 387).

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48. In Miller, we considered whether a letter written by an adult probation officer to the president judge of the county court of common pleas rose to the level of constitutionally protected speech. Miller, 544 F.3d at 546-51. We acknowledged that Miller's statements that the county probation office was being run ineffectively and that her supervisors called probation clients "scum" clearly referred to matters of public concern. Id. at 549. However, the Court then explained that her statements must be viewed in the context of the letter as a whole. Id. at 550. "We can not 'cherry pick' something that may impact the public while ignoring the manner and context in which that statement was made or that public concern expressed.

27

Our inquiry must also consider the form and circumstance of the speech in question." Id. The letter focused on Miller's private grievances as an employee, and the statements about the office's ineffective operations and the supervisor's comments were collateral to the thrust of her complaint. Id. She clearly stated her reason for writing, i.e., that she would no longer work under the stressful conditions she had to face since an individual named Foresman became her supervisor. Id. "That declaration provides the context for all that follows." Id. In short, "Miller was upset with Foresman's supervision of her, and could no longer tolerate being supervised by her," and, given this context, "the brief references to an issue of public concern" could not be read as anything other than "a multi-faceted personal 'gripe' not unlike that voiced in [a questionnaire addressed by the Supreme Court in [Connick v. Myers, 461 U.S. 138 (1983)]."[5] Id. The personal context of the letter, in addition

---

[5] In Connick, an assistant district attorney, who opposed the district attorney's plan to transfer her to another district, distributed a questionnaire to her co-workers regarding this transfer policy, their level of trust in supervisors, office morale, the establishment of a grievance committee, and whether they were pressured into working on political campaigns. See Miller, 544 F.3d at 548-49 (summarizing Connick). As we explained in Miller, the Supreme Court, "after viewing the statement [about pressure to work on political campaigns] in context and considering the circumstances in which she circulated [the questionnaire]," concluded that this "one expression of public concern did not outweigh the District Attorney's interest in

to the tangential relationship between the issues of public concern and the letter's overall thrust, "so minimizes any public concern in the subject of her expression as to tip the First Amendment balance in favor of her employer." Id. at 551. We further noted that the letter harshly criticized Miller's supervisors, seemingly offered President Judge Saxton an ultimatum, and was disrespectful to the president judge himself. Id.

In the end, we stated that Miller, by "launching into an attack on management and her supervisors," managed to "brush ever so gently" against a matter of public concern. Id. However, "that seemingly serendipitous encounter does not convert her personal grievance into protected speech." Id.

According to Defendants, the District Court likewise determined that Munroe's speech failed to implicate a matter of public concern. On the one hand, the District Court stated that, "although the blog as a whole is dominated by personal issues, within certain blog posts are occasional passages that touch upon broad issues of academic integrity, the value of honor, and students' lack of effort." Munroe, 34 F. Supp. 3d at 537 (footnotes omitted). According to the District Court, each topic represented a matter of political and social concern, despite Munroe's use of strong language. On the other hand, the District Court proceeded to point out that "context matters" and to quote from our ruling in Miller. Id.

---

the efficient operation of his office because the questionnaire as a whole was of such limited value to the public." Id. at 549 (citing Connick, 461 U.S. at 154).

29

It then observed that, on the few occasions where Munroe addressed issues of public concern on her blog, she did so in order to discuss personal matters. "Far from implicating larger discussions of educational reform, pedagogical methods, or specific school policies, Plaintiff mostly complained about the failure of her students to live up to her expectations, and focused on negative interactions between herself and her students." Id. at 537-38. The District Court specifically focused on the January 20, 2010 blog post. In this post, Munroe began by noting that she was blogging at work and then explained that she was entering grades and comments for the students' report cards, which she used to take very seriously. Instead of engaging in "any number of important discussions (such as the value of the grading system, her personal opinion on the effectiveness of assigning grades, etc.) that might have touched upon issues of public concern," Munroe stated that her scorn for some students was so extreme that she found it difficult even to indicate that they cooperated in class and that, for some students, none of the comments fit. Id. at 538.

We believe that the District Court ultimately disposed of Munroe's retaliation claim on the basis of the Pickering balancing test. Accordingly, it went on to observe that, even though she "may have occasionally written as a private citizen on matters of public concern," Munroe's "opprobrious tone" was likely to cause a strong reaction from anyone connected with her high school. Id. After "balancing the interests of the parties," id., the District Court reached the conclusion that "Plaintiff's speech, in both effect and tone, was sufficiently disruptive so as to diminish any legitimate

30

interest in its expression, and thus her expression was not protected," id. at 541; see also, e.g., id. at 540-41 ("Because this Court has determined as a matter of law that Plaintiff's comments do not merit protection under the balancing test established by Pickering, . . . ."). Under the circumstances, the District Court's discussion of the "public concern" concept are best understood as part of its application of the Pickering balancing test. In short, it appears that the District Court, in balancing the respective interests, accorded minimal weight to the interests of Munroe and the public in her speech because "the blog's 'overall thrust' devalues the discussion of public issues." Id. at 538 (quoting Miller, 544 F.3d at 550).

Of course, this Court may affirm on any ground supported by the record. See, e.g., Fairview Twp. v. U.S. EPA, 773 F.2d 517, 525 n.15 (3d Cir. 1985). Defendants present a strong case for why Munroe's speech failed to touch on a matter of public concern. While Munroe contends that her blog was "replete with references to her life's experience as an English teacher in an affluent, suburban Philadelphia School District" (Appellant's Brief at 23), she also acknowledges that this blog was intended as a vehicle to keep in touch with friends (and accordingly was never meant to be viewed by the public at large) and that she discussed such mundane topics as her favorite restaurants and family vacations. She admits that most of the "84 blog entries" published between August 9, 2009 and November 25, 2010 had "nothing to do with her school or work." (Id. at 6 (citing A208-A254, A412-A452).) According to Munroe, it is illogical for us to review each and every one of her blog posts. We clearly should take into account the fact that it was

31

not her blog posts on mundane topics like pie recipes and movie reviews that "went viral" once the media discovered her blog. Defendants themselves focused on Munroe's student-related blog posts (to the point of distributing "[c]opies of Mrs. Munroe's blog pertaining to students" at a media briefing (A286)).[6] However, it is also well established that (as we explained in Miller) the courts "can not 'cherry pick' something that may impact the public while ignoring the manner and context in which that statement was made or that public concern expressed." Miller, 544 F.3d at 550. Defendants (rather persuasively) contend that "a plain reading of Plaintiff's blog readily reveals that she was actually using it to vent personal grievances or express her visceral reaction to her daily experiences." (Appellees' Brief at 32.) For instance, her April 3, 2010 blog post featured a list of "Things From This Day That Bothered Me," which were almost all work-related. (A213.) However, this list appeared in the middle of a post that included lists of "Artists Who Annoy the Crap Outta Me and Who I Must Turn Off as Soon as I Hear the Opening Bars to Their Songs, But Who Are Regarded as 'Talent' by Some People" and "Things I Liked About This Day" (none of which involved her work as a public school teacher). (Id.) Even the January 20, 2010 blog post—in which Munroe offered several comments she would like to see added to the "canned" comment list used for students' report cards—was phrased in rather personal terms. She noted, for example, that the grading process was "a complete

---

[6] At oral argument, counsel for Munroe suggested that only one blog post actually "went viral," the January 20, 2010 post setting forth her suggested report card comments.

pain in the ass" and that her "scornful feelings" about certain students "reach such fever pitch" that it was difficult for her to put down "'cooperative in class.'" (A245.) In the end, Munroe's various comments about her students arguably were no different than, inter alia, her restaurant critique.

Nevertheless, we reluctantly assume for the purposes of this opinion that Munroe's speech satisfied the "public concern" requirement.

As the District Court recognized, there were, at the very least, occasional blog posts that touched on broader issues like academic integrity, honor, and the importance of hard work. In particular, Munroe explained in some detail how she attempted to address the concept of honor in class and the often hostile reaction on the part of her students to her efforts (with one student possibly creating a cheat sheet only "TWO days after my lofty speeches, and a single day after they all signed the pledge and pledge wall" (A240)). In the critical January 20, 2010 blog post, she addressed some problems she saw with the grading process, specifically highlighting her past efforts to choose the right combination of positive and negative comments for the report cards and indicating that the "canned comments" did not accurately reflect her assessment of students' performance. (A245.) The list of suggested comments then were a rather clumsy attempt to use humor to highlight her points. Although the District Court criticized Munroe for failing to bolster her "personal invective" with "larger discussions of educational reform, pedagogical methods, or specific school policies," Munroe, 34 F. Supp. 3d at 537-38, it also recognized that the

inappropriate or controversial nature of a statement is irrelevant to the "public concern" inquiry, see, e.g., Snyder, 562 U.S. at 453. After all, humor, satire, and even "personal invective" could be used in order to make or embellish a point about a matter of political, social or other concern to the community, such as a school district's grading policies and practices. Munroe's inclusion of her list of proposed report card comments in a post critiquing the school district's grading process likewise indicated that this blog post ultimately involved more than a purely personal gripe against her students or the administration. In contrast, Miller's letter set forth what was essentially a personal gripe against management and her supervisors. See Miller, 544 F.3d at 550-51.

Munroe's blog posts also became the subject of extensive media coverage, and Munroe gave several interviews to national news organizations wherein she "defended her blog entries, refused to apologize for her opinions, and attempted to focus attention on the 'Education Debate.'" (Appellant's Brief at 8 (citing A114-A115).) We note that Munroe acknowledged that these interviews were driven largely by her desire to defend herself and her actions, and we also are troubled by the fact that the record and briefing contains essentially no evidence regarding the content of these interviews besides Munroe's general

34

characterization of them.[7] In any event, the extensive media coverage of her blog and the statements she made to the media generally indicated that Munroe met the "public concern" element.[8] See Snyder, 562 U.S. at 543 (stating that

---

[7] Like Munroe herself, neither Defendants nor the District Court have devoted much attention to the subsequent media coverage. In a footnote, the District Court stated that it focused on the blog posts because the record was clear that Defendants' actions were based on the posts, and it indicated that its analysis would not change upon consideration of the interviews. The dissent relies heavily on Munroe's statements to the media in arguing that the case should be remanded. We note, however, that the evidence cited by the dissent is limited to arguments and characterizations sprinkled in the briefs. We have no doubt that Munroe gave interviews to the media, but the record is devoid of any actual evidence as to the content of those interviews, rendering it impossible to assess her interest in the actual speech and the effect such speech might have had on the School District. The evidence cited by the dissent regarding the content or tone of her media interviews rests primarily on a news article that is not part of the record.

[8] We also question whether the media and the public were (as Munroe claims) really interested in her thoughts about the so-called "education debate." We wonder whether they were interested instead in the fact that a teacher would post derogatory comments about her students on her blog and whether public school teachers can (and should) make such comments.

35

speech implicates matter of public concern when it is subject of legitimate news interest).

As part of their discussion of the Pickering balancing test, Defendants rely on the Second Circuit's opinion in Melzer v. Board of Education, 336 F.3d 185 (2d Cir. 2003), and the ruling by the Seventh Circuit in Craig v. Rich Township High School District 227, 736 F.3d 1110 (7th Cir. 2013), cert. denied, 134 S. Ct. 2300 (2014). Both circuit courts ultimately rejected retaliation claims—filed by educators who alleged that they were terminated for exercising their First Amendment rights—pursuant to Pickering. Craig, 736 F.3d at 1118-21; Melzer, 336 F.3d at 197-200. Nevertheless, the Second Circuit also assumed that a teacher's First Amendment activity satisfied the "public concern" element, Melzer, 336 F.3d at 196, and the Seventh Circuit expressly determined that a guidance counselor's speech implicated a matter of public concern, Craig, 736 F.3d at 1116-18.

In Melzer, a Bronx High School of Science teacher claimed that his constitutional rights to freedom of association and speech were violated when the board of education terminated his teaching position "in retaliation for his membership in the North American Man/Boy Love Association (NAMBLA or Association)." Melzer, 336 F.3d at 188-89. The Second Circuit assumed arguendo that "his activity centers on a matter of public concern, and is thus protected." Id. at 196. The Melzer court indicated that, "even if we were somehow to parse Melzer's activity into the public concern test, most of it would likely pass." Id. In short,

36

NABMLA's stated goal is to effect change in public attitudes and laws regarding the age of consent, and advocacy in support of such a goal "is certainly a matter of public concern, regardless of the underlying subject matter." Id.

The plaintiff in Craig "self-published a short book of adult relationship advice entitled 'It's Her Fault.'" Craig, 736 F.3d at 1113. "And when we say 'adult,' we mean it in every sense of the word—in his book, Craig repeatedly discusses sexually provocative themes and uses sexually explicit terminology." Id. The Seventh Circuit agreed with Craig that his work dealt with a subject of general interest to the public (and that the district court erred by concluding otherwise). Id. at 1115-18. While the district court was correct that some parts of "It's Her Fault" (like Craig's description of his own sexual exploits) would not relate to a matter of public interest if viewed in isolation, it was wrong to conclude "that just because the book happened to touch[ ] on a matter of public interest (relationships between men and women) does not mean that it addresses a matter of public concern.'" Id. at 1117. According to the Craig court, "[t]hat is precisely what public concern means—speech directed to the public need only address a 'matter[ ] in which the public might be interested' in order to be eligible for First Amendment protection." Id. "Viewed as a whole, 'It's Her Fault' addresses adult relationship dynamics, a subject that interests a significant segment of the public. The proliferation of advice columns dealing with precisely this topic is a testament to its newsworthiness." Id..

37

Although we assume that Munroe's speech implicated a matter of public concern, this does not mean that her speech constituted speech protected by the First Amendment. We conclude (like the Second and Seventh Circuits) that, even if Munroe's speech was a matter of public concern, it was not constitutionally protected because the Pickering balancing test weighed in favor of Defendants.

## B.      Pickering Balancing Test

"On the employee's side of the scale, we must consider the interests of both [Munroe] and the public in the speech at issue." Dougherty, 772 F.3d at 991. On the other side of the Pickering balancing test, the Court must address "the government's legitimate and countervailing interest, as an employer, in 'promoting workplace efficiency and avoiding workplace disruption.'" Id. (quoting McGreevy v. Stroup, 413 F.3d 359, 363 (3d Cir. 2005)). The government need not show the existence of actual disruption if it establishes that disruption is likely to occur because of the speech. See, e.g., id. at 992 & n.7. While the inquiry varies given the nature of the speech at issue, courts typically consider whether the speech impairs discipline or employee harmony, has a detrimental impact on close working relationships requiring personal loyalty and confidence, impedes the performance of the speaker's duties, or interferes with the enterprise's regular operations. See, e.g., id. at 991. "The balancing we must undertake is a fact-intensive inquiry that requires consideration of the entire record, and must yield different results depending on the relative strengths of the issue of public concern and the employer's interest." Miller,

38

544 F.3d at 548. In short, the inquiry "involves a sliding scale," in which "the amount of disruption a public employer has to tolerate is directly proportional to the importance of the disputed speech to the public." Id. at 549 n.2; see also, e.g., Dougherty, 772 F.3d at 991 ("The more tightly the First Amendment embraces the employee's speech, the more vigorous a showing of disruption must be made by the employer.").

We begin with Munroe's alleged interest and the alleged interest of the public in her blog posts and subsequent statements to the media. According to Munroe, the District Court was so preoccupied with her personal complaints (and the manner in which she chose to express herself) that it accorded little if any weight to these interests. Munroe contends that "the public was highly interested in a public school teacher's thoughts about the education debate," and her "blog, likely because of the strong language used by her, percolated a national conversation about the performance and expectations of students in an affluent, suburban public high school." (Appellant's Brief at 26.) Given our reluctance to assume that the speech at issue here implicated a matter of public concern in the first place, we determine that the interests of Munroe and the public in this speech were entitled to (at best) only minimal weight under the Pickering balancing test.

In Dougherty v. School District of Philadelphia, 772 F.3d 979 (3d Cir. 2014), this Court recently applied the Pickering balancing test in favor of an individual who was fired from his position as "the Deputy Chief Business Officer

39

for Operations and Acting Chief of Operations for the Office of the Deputy Superintendent within the School District of Philadelphia" after he publicly disclosed the alleged misconduct of the school district superintendent in steering a contract, id. at 982-83. According to Munroe, the Philadelphia School District attempted to devalue the constitutional merit of a teacher's expression on the grounds that his statements were focused on personal concerns about his employment—an attempt this Court rejected. She claims that the District Court similarly erred here in devaluing her speech. However, she actually quotes from the section of the Dougherty opinion addressing the distinct question of whether Dougherty was speaking as a citizen. Id. at 987-90. While it is undisputed that Munroe was speaking here as a private citizen, it was, in turn, uncontested that Dougherty's speech involved a matter of public concern. Id. at 987. Furthermore, Dougherty was not a teacher; he instead served as a business and operations manager for a school district responsible for, among other things, developing capital projects and soliciting bids for these projects. Id. at 982-83. The issue addressed in Dougherty and the facts presented therefore are readily distinguishable.

We further explained that "'[s]peech involving government impropriety occupies the highest rung of First Amendment protection.'" Id. at 991 (quoting Swineford v. Snyder Cnty., 15 F.3d 1258, 1274 (3d Cir. 1994)). Noting that Dougherty's report to The Philadelphia Inquirer exposing the superintendent's alleged misconduct constituted an archetypical example of this sort of expression, the Court observed that the defendants had to satisfy a truly heavy

40

burden "[a]gainst the public's significant interest in Dougherty's act of whistleblowing" (a burden that they did not meet). Id.; see also, e.g., id. at 987 n.5 ("As we have long recognized, '[d]isclosing corruption, fraud, and illegality in a government agency is a matter of significant public concern.'" (quoting Feldman v. Phila. Hous. Auth., 43 F.3d 823, 829 (3d Cir. 1994))). Munroe does not claim that she exposed any corruption, fraud, or other forms of illegal conduct on the part of Defendants (or anyone else). If anything, her blog more closely resembled "It's Her Fault"— the work of adult relationship advice at issue in Craig—as opposed to the acts of whistleblowing considered in Dougherty. While it determined that this book touched on a matter of public concern, the Seventh Circuit went on to explain (as part of its Pickering analysis) that a guidance counselor's "view of relationships is not the sort of topic of expression that Defendants would require a compelling reason to restrict." Craig, 736 F.3d at 1120.

Given our assessment of the interests of Munroe and the public in her speech, Defendants were not required to make an especially vigorous showing of actual or potential disruption in this case. However, even if we were to assume arguendo that her speech "possesses the highest value," Melzer, 336 F.3d at 198, we would still conclude that Defendants met their burden. Simply put, "Plaintiff's speech, in both effect and tone, was sufficiently disruptive so as to diminish any legitimate interest in its expression, and thus her expression was not protected." Munroe, 34 F. Supp. 3d at 541.

41

Munroe attacks the District Court for focusing on the opprobrious tone of her blog posts and suggesting that her expression would be afforded greater protection if she engaged in a more lofty discussion of educational issues. Claiming that "[i]t is essential to remember that '. . . the very core of the First Amendment is that the government cannot regulate speech 'because of its message, its ideas, its subject matter, or its content,'" she contends that the District Court's content-based approach "has no place in the Pickering test." (Appellant's Brief at 24 (quoting Startzell v. City of Phila., 533 F.3d 183, 192 (3d Cir. 2008)).) However, the opinion she cites did not involve a retaliation claim against a public employer. See Startzell, 533 F.3d at 188 ("The parties to the events surrounding the October 2004 OutFest [a street festival] have differing, indeed contrary, views of the protection that the First Amendment affords to organizers of events that generate counter-protests and the rights of those counter-protestors."). It is well established that a government has broader powers to regulate speech when it acts as an employer than when it acts as a sovereign. See, e.g., Waters, 511 U.S. at 671 (plurality opinion); Pickering, 391 U.S. at 568. Accordingly, in order for his or her speech to be protected by the First Amendment, the employee must speak as a citizen, the speech must implicate a matter of public concern, and, of particular significance here, "the government must lack an 'adequate justification' for treating the employee differently than the general public based on its needs as an employer under the Pickering balancing test." Dougherty, 772 F.3d at 987. While the inappropriate tone of the speech may be irrelevant to the "public concern" inquiry, see, e.g., Snyder, 562 U.S. at 453, such considerations could play a

42

critical role in ascertaining the existence and likelihood of disruption. After all, it would seem more likely that an employee's comments about his or her supervisors and co-workers would impair discipline or employee harmony if they are phrased in less "elevated"—and more "opprobrious"—terms. Likewise, invective directed against the very persons that the governmental agency is meant to serve could be expected to have serious consequences for the performance of the speaker's duties and the agency's regular operations. The First Amendment, for instance, does not require a public employer "to sit idly by" while its police officers and firefighters make racial insults against "those they are hired to serve and protect." Locurto v. Giuliani, 447 F.3d 159, 183 (2d Cir. 2006); see also, e.g., Pickering, 391 U.S. at 569-70 ("The statements are in no way directed towards any person with whom appellant would normally be in contact in the course of his daily work as a teacher."); Craig, 736 F.3d at 1119 ("An employer may have more leeway in restricting the speech of an employee whose position requires contact with the public.").

Similarly, we believe it was appropriate for the District Court to consider whether Munroe's speech "would erode the necessary trust and respect between Munroe and her students." Munroe, 34 F. Supp. 3d at 539. Munroe views such considerations as nothing more than "code" for punishing unpopular speech, and she contends that they would allow a school district to fire a teacher on the grounds of political affiliation, religion, or grading policies, thereby making a mockery out of the First Amendment itself. (Id. at 27.) She even goes so far as to claim that "[h]igh school

43

students are not required to trust or respect their teachers." (Id. at 27-28.) In Pickering itself, the Supreme Court indicated that it was appropriate to consider whether a teacher's expression "either impeded the teacher's proper performance of his daily duties in the classroom" or "interfered with the regular operation of the schools generally."[9] Pickering, 391 U.S. at 572-73 (footnote omitted). As the District Court noted, the job of a public school educator implicates a rather special set of circumstances and responsibilities. "Plaintiff worked in a school, where students 'are impressionable and their attendance is involuntary.'" Munroe, 34 F. Supp. 3d at 539 (quoting Edwards v. Aguillard, 482 U.S. 578, 584 (1987)). One generally expects that a teacher would: (1) refrain from expressing outright hostility and disgust against them on her blog (at least where the blog itself was not protected by a password and evidently could be (and, in this case, was) discovered by the media and members of the school community); (2) when confronted with her derogatory

---

[9] The Pickering Court determined that a letter a teacher sent to a local newspaper criticizing the school board's handling of bond issue proposals and its subsequent allocation of financial resources and charging the superintendent with attempting to prevent teachers from opposing or criticizing the proposed bond issue constituted protected speech because, even if he made some erroneous statements, it could neither be shown nor presumed that his letter impeded the performance of his daily classroom duties or interfered with the regular operation of the school. Pickering, 391 U.S. at 572-73.

44

comments, publicly defended what she had said; and (3) in the process, singled out specific and identifiable students as the targets of her ire. As the PSBA helpfully notes in its amicus brief, the Pennsylvania Code of Professional Practice and Conduct for Educators states, inter alia, that professional educators are expected to value "the worth and dignity of every person, student and colleague alike," 22 Pa. Code § 235.3, and to exercise care in maintaining confidentiality, 22 Pa. Code § 235.4(b)(9).

"The position of public school teacher 'requires a degree of public trust not found in many other positions of public employment.'" Munroe, 34 F. Supp. 3d at 539 (quoting Melzer, 336 F.3d at 198). A teacher generally acts *in loco parentis* for his or her students. Melzer, 336 F.3d at 199; see also Craig, 736 F.3d at 1119 ("The fact that Craig works closely with students at a public school as a counselor confers upon him an inordinate amount of trust and authority." (citing Edwards, 482 U.S. at 584; Melzer, 336 F.3d at 198)). Like the Second Circuit, "[w]e acknowledge the truism that community reaction cannot dictate whether an employee's constitutional rights are protected." Melzer, 336 F.3d at 199. The First Amendment generally does not permit the so-called "heckler's veto," i.e., "allowing the public, with the government's help, to shout down unpopular ideas that stir anger." Id.; see also Craig, 736 F.3d at 1121 (referring to "heckler's veto" in which unpopular speech is prohibited on account of community's possible reaction). However, there is a special (perhaps even unique) relationship that exists between a public school teacher (or other educators, like a guidance counselor), on the one hand, and his or her students

45

and their parents, on the other hand. Simply put, neither parents nor students could be considered as outsiders seeking to "heckle" an educator into silence—"'rather they are participants in public education, without whose cooperation public education as a practical matter cannot function.'" Craig, 736 F.3d at 1121 (quoting Melzer, 336 F.3d at 199). We accordingly agree with the Second and Seventh Circuits that it is generally appropriate to consider the reactions of students and parents to an educator's speech under the Pickering balancing test.[10]  Id. ("Given the nature of this case,

---

[10] We further note that this case does not involve an attempt to fire a teacher because of student and parent reactions to his or her political affiliation or religion.

46

we think it appropriate to consider Defendants' interests in preserving a safe counseling environment at Rich Central as

---

Munroe suggests that the effects of her speech on the trust and respect of her students should not be considered because this Court's ruling in Dougherty did not identify such effects as a factor to be taken into account under the Pickering balancing test. We have already noted that Dougherty was not a teacher—he was a business and operations officer. Dougherty, 772 F.3d at 982-83. We also observed in Dougherty that "the test for disruption varies depending upon the nature of the speech" and that the "factors a court typically considers" include whether the speech impedes the performance of the speaker's duties or interferes with the regular operations of the enterprise. Id. at 991; see also, e.g., Pickering, 391 U.S. at 572-73 (asking whether speech impeded teacher's proper performance of daily duties in classroom or interfered with regular operation of the schools generally). Furthermore, we agree with Munroe that her relationship with Defendants was not the kind of relationship that required personal loyalty or confidence. See, e.g. Dougherty, 772 F.3d at 992 ("[B]ased on the District Court's reading of the record, the evidence does not compel the conclusion that Dougherty's relationship with Dr. Ackerman [the superintendent] or Dr. Nunery [the deputy superintendent] is 'the kind of relationship[ ] for which it can persuasively be claimed that personal loyalty and confidence are necessary to [its] proper functioning.'" (quoting Pickering, 391 U.S. at 570)). However, a defendant need not establish the existence of such a relationship to prevail under Pickering.

part of our analysis."); Melzer, 336 F.3d at 199 ("Any disruption created by parents can be fairly characterized as internal disruption to the operation of the school, a factor which may be accounted for in the balancing test and which may outweigh a public employee's rights.").

We find that Munroe's various expressions of hostility and disgust against her students would disrupt her duties as a high school teacher and the functioning of the School District. Munroe, for her part, does not really deal with the specific language she used in her blog posts. Instead, she tends to describe her student-related comments in rather general terms, e.g., she purportedly made comments about her students' unwillingness to work hard and cooperate in school, the lack of student accountability, and the lack of support for teachers on the part of both parents and administrators. However, Munroe's list of "proposed report card comments" (Appellant's Brief at 25) included statements like—"A complete and utter jerk in all ways," "Rat-like," "Lazy asshole," "Sneaky, complaining, jerkoff," "Dresses like a street walker," "Rude, belligerent, argumentative fuck," "Am concerned your kid is going to come in one day and open fire on the school. (Wish I was kidding.)," "I hear the trash company is hiring," "Utterly loathsome in all imaginable ways," and "There's no other way to say this: I hate your kid" (A245-A246). Munroe went so far as to include a depiction of a school bus at the top of the post—together with a comment disparaging special needs students: "I Don't Care If You Lick The Windows, Take The Special Bus Or Occasionally Pee On Yourself . . . You Hang In There Sunshine, You're Friggin Special." (A245 (emphasis

48

omitted).) Even if intended as part of a comedic exercise, such characterizations speak for themselves. Simply put, they were despicable. Furthermore, Munroe, in multiple blog posts, ranted against her own students. To give just a few examples, she called them "the devil's spawn" (A237), "Noisy, crazy, sloppy, lazy LOAFERS" (A440), and "rude, disengaged, lazy whiners" (id.). As the District Court then explained, "[t]he discovery of the blog undermines Plaintiff's early assumptions that her small readership and relative anonymity would protect her personal comments from reaching their subjects, especially as the blog was not password protected." Munroe, 34 F. Supp. 3d at 538. In addition, students would have been able to identify themselves or their classmates in at least some of her derogatory comments. Parents likewise could occasionally identify both themselves and their children from her "vivid and personal appraisal of [student] character." Id. at 539. In her blog post identifying the "Things From This Day That Bothered Me," Munroe singled out "the jerk who was out 3 days around our last assessment because his family took him on trip to Puerto Rico" and who "was out again today (the date of another assessment) because his family took him to the effing Master's golf shit over Easter break." (A213.) She also pointed, inter alia, to the fact that she called home about an obnoxious student the week before the break and, even though his mother "said they told him to 'knock it off,'" the first thing he did when he saw her was to mock her failed effort to ruin his weekend. (Id.) Munroe claimed in another blog post that a female student (described as the girl in the back in pink) made a cheat sheet only two days after Munroe's speech about honor and integrity and one day after

49

the class signed an honor pledge. Even the "report card comments" she wished to add to the "canned" comment list were often phrased in suspiciously specific terms.

We also observe that Munroe "did not take a conciliatory approach" in her subsequent media appearances. Id. at 538. Instead, she purportedly defended her blog entries and refused to apologize for the comments. Students and parents were thereby presented with a teacher who expressed hostility and disgust against her own students and who, when publicly confronted with her comments, not only refused to apologize—but even went so far as to defend her derogatory statements in the local and national media.

It would be an understatement to say that Munroe's speech caused rather negative reactions on the part of both students and their parents. Likewise, it is wrong to claim (as Munroe does in her appellate brief) that "the School District [at most] demonstrated that some township residents were unhappy with Munroe's comments." (Appellant's Brief at 28.) According to CB East's principal, the students were "furious" and "livid," and the school was "like a ticking time bomb." (A397.) "To say it was a disruption to the learning environment is an understatement." (A398.) Lucabaugh then began to receive e-mails from parents indicating that they did not want Munroe to teach their children, and (as the District Court noted) students were permitted to opt out of Munroe's class. The School District hired another person to "shadow" Munroe. In other words, another educator was paid to teach the same exact schedule as Munroe herself. While Munroe views the Defendants' decision to inform residents in August

50

2011 that they would honor all "opt-out" requests as an unprecedented step meant to set her up for failure, she also acknowledged in her deposition testimony that the whole situation was probably unprecedented. In fact, it appears uncontested that Lucabaugh continued to receive more and more e-mails from concerned parents throughout the summer and peaking in June and July of 2011. "[N]ow I'm talking over seventy-five people, eighty people, ninety people, one hundred people, a hundred and—and it was growing." (A399.) When a teacher's derogatory comments about his or her students cause numerous parents to tell the school district that they "don't want her as my child's teacher" (id.), it is appropriate to conclude that his or her speech "'impedes the performance of the speaker's duties'" as a teacher. Dougherty, 772 F.3d at 991 (quoting Rankin, 483 U.S. at 388). Such speech then "'interferes with the regular operation of the enterprise'" because the school district hired another teacher to accommodate the sheer and unprecedented number of parental "opt-outs" it received. Id. (quoting Rankin, 483 U.S. at 388); see also Pickering, 391 U.S. at 572-73 (considering whether teacher's speech "either impeded the teacher's proper performance of his daily duties in the classroom" or "interfered with the regular operation of the schools generally" (footnote omitted)).

Munroe does point out that she was allowed to return to work the following school year (after her paid suspension and maternity leave ended) and that, after then teaching for a full year, she was ultimately terminated—supposedly on account of her poor performance. When she returned to work, Lucabaugh informed the media that "[n]o one here is

51

contending that she can't say these things ... legally" and that "she has a legal right to return." (A286.) According to Munroe, Defendants thereby recognized that Munroe's right to free expression outweighed any disruption and accordingly chose not to terminate her when she returned to work in August 2011. She claims that "the School District cannot now be heard to say that a threat of disruption to the operation of its schools outweighed Munroe's rights." (Appellant's Brief at 31.) Munroe further contends that the District Court evidently determined that disruption automatically barred her claim, instead of treating such disruption as a factor to be weighed as part of what this Court in Dougherty recognized as a true balancing test.

While Defendants' actions here were somewhat unusual and further complicate an already difficult situation, we do not agree that they are now somehow estopped or barred from claiming that the actual and potential disruption caused by Munroe's speech outweighed her free speech rights—or that such actions on their part otherwise meant that there was no disruption (or that the Pickering balancing test necessarily weighed in favor of Munroe). After all, Defendants need not make out a particularly strong showing of disruption in this case given the weakness of Munroe's interest, as well as the interest of the public, in her speech. See, e.g., Miller, 544 F.3d at 549 n.2. In Dougherty, we acknowledged that Dougherty's speech caused actual disruption to the school district, but we then highlighted the absurdity of allowing corrupt officials to punish their whistleblowing subordinates because the speech had a somewhat disruptive effect. Dougherty, 772 F.3d at 992-93.

52

Munroe, unlike Dougherty, was not a whistleblower. The District Court, in any event, appropriately took into account the competing interests and then determined that the speech at issue here was not protected because the disruption diminished any legitimate interest in its expression. Furthermore, the First Amendment does not require a school district to continue to employ a teacher who expresses the kind of hostility and disgust against her students that Munroe did on her blog and then publicly defends such comments to the media—which results in serious negative reactions on the part of both students and parents, the submission of numerous parental "opt-out" requests, and the hiring of an additional teacher. It appears that Munroe could have been fired when Defendants became aware of her blog posts (although the fact that she was scheduled to begin her maternity leave may have complicated the situation) or at least at the beginning of the next school year. But Defendants should not be held liable for violating the First Amendment simply because they (rather generously) hired another teacher and permitted Munroe to return to work or because of what was said at the principal's media briefing. As the District Court also noted, Lucabaugh did not explain whether his assessment was premised on the United States Constitution, state law, or the terms of Munroe's employment contract. In fact, C.B. East's principal made it clear that Munroe's speech caused disruption and harmed C.B. East's students, explaining that "[w]hat is at the heart of this issue, however, is the large-scale disruption her comments created, and the ensuing damage they have caused the young men and women to whom she was alluding." (A286.)

53

In Melzer, the Second Circuit assumed that Melzer's activities on behalf of NAMBLA possessed the highest value under the First Amendment and placed a heavy burden on the board of education to justify his dismissal. Melzer, 336 F.3d at 198. However, it still concluded that, given the nature of his position as a public school teacher, "the disruption they cause is great enough to warrant the school's action against him." Id. While some parents and students expressed support for his free speech rights and there were certain minor discrepancies with respect to the reported disruption, "[i]t is nonetheless entirely reasonable for the Board to believe that many parents and students had a strong negative reaction to him, and that such a reaction caused the school to suffer severe internal disruption." Id. A psychological expert testified that a teacher with Melzer's beliefs would provoke anxiety for the average student (e.g., he or she would be unable to concentrate or would be uncomfortable asking for help after class). Id. at 198-99. The Second Circuit pointed out that, while "[h]e acts *in loco parentis* for a group of students that includes adolescent boys," he simultaneously "advocates changes in the law to accommodate his desire to have sexual relations with such children." Id. at 199. "We think it is perfectly reasonable to predict that parents will fear his influence and predilections. Parents so concerned may remove their children, thereby interrupting the children's education, impairing the school's reputation, and impairing educationally desirable interdependency and cooperation among parents, teachers, and administrators." Id. In fact, several parents threatened to remove their children from the school, and Melzer candidly admitted that it would be

54

difficult for him to decide whether to report an incident of child molestation.[11]  Id. at 191, 199.

Similarly, we find it significant that the Seventh Circuit determined that the defendants' interests in remedying the potential disruption caused by a guidance counselor's book of adult relationship advice outweighed his own speech interest.  Craig, 736 F.3d at 1119.  As the Craig court explained, "Defendants' assessment of how Craig's students, and particularly his female students, would respond upon reading or hearing about the hypersexualized content looms large in our analysis."  Id.  For instance, female students could easily feel uncomfortable asking for his advice given

---

[11] According to the Second Circuit, "the employee may still carry the day [even if the government prevails in the balancing test] if he can show that the employer's motivation for the discipline was retaliation for the speech itself, rather than for any resulting disruption.'"  Melzer, 336 F.3d at 193 (citing Sheppard v. Beerman, 94 F.3d 823, 827 (2d Cir. 1996)).  The Second Circuit found no proof that the board of education's decision to terminate Melzer was motivated by his NAMBLA membership (which was known to the board for a number of years).  Id. at 199-200.  Unlike Melzer, Munroe has not raised this issue before either the District Court or this Court.  In fact, Munroe failed to address the Melzer opinion in her District Court briefing, even though Defendants addressed it in their own briefs.  She likewise fails to mention this opinion in her appellate briefing (although it was cited by the District Court, and Defendants rely on the Second Circuit's ruling in their appellate brief).

"his professed inability to refrain from sexualizing females." Id. at 1120. Likewise, some students could be apprehensive about speaking with Craig on account of his derogative view of women. Id. He specifically claimed in his book—which, after all, was entitled "It's Her Fault"—that women do not succeed in relationships because of their tendency to act based only on their emotions and emphasized "the importance of a woman's sexual 'submissiveness' to her male partner." Id. The Seventh Circuit understandably asked whether a female high school student would really speak with a guidance counselor about future career options knowing he believed women are not inclined to rational thought or go to him to discuss relationship issues given his views about sexual submissiveness.[12] Id.

Obviously, Munroe does not support sexual relations with minors, and she likewise did not publish a book confessing to her inability to refrain from sexualizing her students. However, she still expressed hostility and disgust

---

[12] Defendants and the District Court have also cited to a 1981 ruling by the Sixth Circuit. In Anderson v. Evans, 660 F.2d 153 (6th Cir. 1981), the panel majority concluded that the defendants did not violate the First Amendment when they terminated an elementary school teacher who made racially charged remarks that, inter alia, had a detrimental effect on the school and the community it served, id. at 159. In short, "the interest of the school board in maintaining an efficient and regularly functioning school system and in employing effective teachers outweighed Mrs. Anderson's interest in making the remarks." Id.

against her own students. "Is it unreasonable to think a [CB East student] who learned that[, to give just one example, Munroe referred to her students as 'the devil's spawn' (A237)] may decide against" asking her advice?  <u>Id.</u> Likewise, how could students be expected to participate in a class when a teacher indicated that she wished she could use terms like "Rat-like" on their own report cards (even if her list was intended as a humorous exercise)?  (A245.) Accordingly, we determine that, pursuant to the <u>Pickering</u> balancing test, Munroe's speech did not constitute speech protected by the First Amendment.

## III.

We will affirm the order of the District Court granting Defendants' motion for summary judgment.

57

Natalie Munroe v. Central Bucks School District, et al.
No. 14-3509

_____

AMBRO, <u>Circuit Judge</u>, dissenting

My colleagues focus on Ms. Munroe's claim that she was retaliated against for authoring offensive blog posts. This is an issue that is closer than they suggest. However, I need not deal with it, as there is more to Munroe's lawsuit than blog posts to friends that became public. A critical component is the allegation that the TV and print interviews Munroe gave following her suspension by the School District factored into its discharge decision 15 months later. Unexplainably, the District Court declined to address this argument, saying only in a footnote that, even if it had considered the interviews, that wouldn't have changed its decision to enter summary judgment. *See Munroe v. Cent. Bucks Sch. Dist.*, 34 F. Supp. 3d 532, 538 n.65 (E.D. Pa. 2014). That is not very satisfying. If Munroe had a First Amendment right to say her piece before a national audience, and no doubt she did (even the School District acknowledged this), then summary judgment is inappropriate to the extent her TV appearances, coupled with her comments made to print media, played a role in her dismissal and the School District wouldn't have taken the same action absent them. *See Miller v. Clinton Cnty.*, 544 F.3d 542, 548 (3d Cir. 2008).

Like the District Court, my colleagues duck this argument. Their out, however, is that Munroe didn't "devote[] much attention to the subsequent media coverage," Maj. Op. 35 n.7, and provided "essentially no evidence regarding the content of the[] interviews besides [her] general characterization of them," *id.* at 34–35. Because I do not share that assessment and would reverse to allow a jury to consider whether Munroe's interviews with the media

1

contributed to the allegedly retaliatory dismissal, I respectfully dissent.

The first order of business is to determine whether Munroe adequately preserved the claim that she was retaliated against for discussing her suspension with various news organizations. Parting ways with the conclusion of my colleagues, *see* Maj. Op. 35 n.7, I think the answer is a resounding yes. Though Munroe may not have made the claim the focus of her case, she certainly raised it at every stage in the District Court and again on appeal. In her complaint, she alleges that the School District punished her for appearing on "CBS, ABC, NBC, CNN, Fox News" and giving interviews to, among others, "Time Magazine, Reuters, the Associated Press, [and] the Philadelphia Inquirer," and that all these appearances "were protected under the First Amendment." Am. Compl. ¶¶ 23–29. Likewise, her response to the School District's summary-judgment motion argues that she "engaged in two types of speech, each of which [is] protected under the First Amendment[:] First, [she] blogged to her friends and family about her experiences at CB East . . . . [;] [and] [s]econd, [she] engaged the media in a very public debate about her blog and the Education Debate discussed in [it]." Pl.'s Opp'n Defs.' Mot. Summ. J. 15–16. And the District Court apparently thought enough of the argument to address it (though only in a footnote), positing that "the analysis would not change . . . upon consideration of the interviews [Munroe] gave to the media." *Munroe*, 34 F. Supp. 3d at 538 n.65.

Finally, on appeal in the section of her brief titled "Statement of the Issue Presented for Review," Munroe poses the following question: "Did the District Court err in holding that a public school teacher's opinions about matters of public concern, published in her blog *and stated in interviews to various media outlets*, were unworthy of First

Amendment . . . protection under the *Pickering v. Board of Education* [391 U.S. 563 (1968)] balancing test?" Munroe Br. 1 (emphasis added). She also addresses the claim in the section of her brief titled "Rulings Presented for Review," Munroe Br. 14, and develops her argument in later sections, *see id.* at 26 (asserting that her media appearances implicated a matter of public concern), *id.* at 28 (pointing out that "there was no evidence offered to demonstrate that [her] blog entries, *or her interviews with the media*, prevented her from doing her job as a high school English teacher" (emphasis added)). Even the School District deems Munroe's argument about the media interviews important enough to address. It contends that the interviews shouldn't receive First Amendment protection and, in any event, "there is no genuine issue of any material fact that Plaintiff would have been terminated even in the absence of her blog *and media tour*." School Dist. Br. 51 (emphasis added). In this context, Munroe has adequately raised, both before the District Court and on appeal, whether her media interviews were a reason for the retaliation she alleges. I thus move to the merits.

To succeed on her claim, Munroe must establish that the interviews were "protected by the First Amendment and . . . [were] a substantial or motivating factor" in the allegedly retaliatory discharge. *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 986 (3d Cir. 2014); *see also Miller*, 544 F.3d at 548. If she succeeds, the burden shifts back to the School District to show it would have fired her regardless whether she had told her story before a national audience. The First Amendment question—which, per *Pickering*, balances "the interest in freedom of expression against the employer's interests[—]is to be done by the judge, not the jury." *Dishnow v. Sch. Dist. of Rib Lake*, 77 F.3d 194, 198 (7th Cir. 1996) (Posner, J). The causation issues, by contrast, the jury decides. *See Watters v. City of Phila.*, 55 F.3d 886, 892 n.3 (3d Cir. 1995).

3

The threshold issue in determining if Munroe's speech was protected by the First Amendment is whether her interviews with the national media implicated a matter of public concern. *See Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1115 (7th Cir. 2013). If she can show this, the School District's interest in promoting an "effective and efficient" learning environment is balanced against Munroe's interest in commenting on her suspension. *Id.* at 1118 (quoting *Chaklos v. Stevens*, 560 F.3d 705, 714 (7th Cir. 2009) (internal quotations marks omitted)). The outcome of that test, called *Pickering* balancing, yields the answer to whether the First Amendment protects Munroe's TV appearances and print interviews.

On the public-concern question, I see no difficulty (nor apparently do my colleagues, *see* Maj. Op. 34–35) in concluding that Munroe's TV appearances involved a matter of "legitimate news interest," *San Diego v. Roe*, 543 U.S. 77, 84 (2004) (*per curiam*), or a matter "in which the public might be interested," *Dishnow*, 77 F.3d at 197. *See also Eberhardt v. O'Malley*, 17 F.3d 1023, 1026 (7th Cir. 1994) (Posner, J.) ("The First Amendment protects entertainment as well as treatises on politics and public administration."). The relevant sequence of events is instructive.

After the public learned of Munroe's blog, Central Bucks High School East ("CB East") Principal Abram Lucabaugh moved swiftly to suspend her and issued a televised statement explaining the School District's decision to do so. Caught off guard by the public announcement, Munroe "felt . . . it was necessary to share [her] side of the story." Munroe Dep. Tr. 58:5–12. Luckily for her, the suspension became a national news story, and when it did a number of highly prominent news programs invited her to discuss the situation on live TV. Among them were ABC's *Good Morning America* and Fox News's *Fox and Friends*

4

and *Justice with Jeanine*. *Time Magazine* and *The Philadelphia Inquirer*, among others, likewise wanted the scoop. While Munroe maintains she focused on whether "today's youth is overindulged, underworked, and self-entitled" and whether "their parents and schools have been complicit in creating this result," Pl.'s Reply Mem. Law Opp. Defs.' Mot. Summ. J. 3, the School District argues otherwise. It contends that Munroe used the interviews to defend herself, not to engage in a public debate. The likely answer is a combination of both, but the key is that Munroe's media tour focused on an event that had already captured the public's attention: the suspension of a public school teacher for criticizing her students on a publicly available blog. As one prominent publication put it, Munroe found "herself in the middle of a swirling online debate—not over what she did, but over what she said about the sometimes harsh realities of the 21st century classroom." Kayla Webley, *How One Teacher's Angry Blog Sparked a Viral Classroom Debate*, TIME (Feb. 18, 2011), http://content.time.com/time/printout/0,8816,2052123,00.html. Munroe's intimate familiarity with the facts made her account all the more newsworthy. Viewed in that light, Munroe's failure to introduce in court a play-by-play of her media appearances is of no consequence.

Having concluded that Munroe's media tour implicated a matter of public concern, I turn to the *Pickering* balancing portion of the analysis. On that front, to repeat, a court must "balance the employee's interest in engaging in her speech with the employer's countervailing interests." *Miller*, 544 F.3d at 548. In the school context, those interests include a teacher's ability to fulfill her duties in the classroom. *See Melzer v. Bd. of Educ. Dist. of City of N.Y.*, 336 F.3d 185, 198–99 (2d Cir. 2003). "[T]he amount of disruption a public employer has to tolerate is directly proportional to the importance of the disputed speech." *Miller*, 544 F.3d at 549 n.2.; *see also Dishnow*, 77 F.3d at 197

5

(noting that the public employer must show that it "had a convincing reason to forbid the speech" in question). Though the School District argues that its "interest in curtailing speech that affected [CB East]'s operation [is] great," School Dist. Br. 40, it has pointed to nothing suggesting that Munroe's appearances in the national media (as distinct from her blog) interfered with her ability to educate her students. Nor has it argued that Munroe's decision to tell her side of a story that spawned a spirited public debate negatively affected employee morale. My colleagues have no answer and say only that the First Amendment doesn't require a school district to continue employing a teacher "who, when publicly confronted with her comments, not only refused to apologize—but even went so far as to defend her derogatory statements in the local and national media." Maj. Op. 50.

The most that can be said of these arguments is that Munroe didn't "take a conciliatory approach" when interviewed and "fanned the flames of controversy." *Munroe*, 34 F. Supp. 3d at 538. But, even if true, it says nothing about whether this made the job of running CB East more difficult. Furthermore, it is hard to take seriously the School District's disruption argument when it did virtually nothing to quell the disorder that supposedly prevented CB East from satisfying its educational mission. After Munroe's blog became public and the ensuing firestorm of publicity, the School District could presumably have asserted that its educational obligations outweighed Munroe's free-speech rights and discharged her. But it opted instead to suspend her, which was of minimal import to Munroe, as this coincided with her planned maternity leave. The School District had a second opportunity to dismiss (or, at the very least, transfer) Munroe

6

when, after her suspension was lifted,[1] CB East students opted out of her class *en masse* in August 2011. But again the School District didn't do so. The result, in my view, is that the School District forfeited its right to match its operational interests against Munroe's free speech interests.

For these reasons, I see no path to conclude that the *Pickering* balance weighs in the School District's favor.

That takes me to the final two questions, both of which deal with causation. First, were Munroe's interviews a motivating factor in the School District's discharge decision? *See Watters*, 55 F.3d at 892 (noting that, to succeed on a retaliation claim, a "plaintiff must show that the protected activity was a substantial or motivating factor in the alleged retaliatory action"). If they were, has the School District carried its burden to show that it would have reached the same decision regardless of the interviews? *See id.* Precedent counsels us to tread carefully when deciding issues of causation on summary judgment—all the more so here.

That School District officials were upset about Munroe's media tour is made plain by two "smoking-gun" emails. After seeing Munroe appear on Fox News, a School District director, John Gamble, told his colleagues he was "confident [the Board] [was] doing the right thing." To remove any doubt about what "doing the right thing" refers to, we need only look at the bottom of Gamble's email, which makes clear it was sent in response to the "termination plan" Superintendent N. Robert Laws had circulated. At the end of that email, Laws too revealed how he felt about Munroe's

---

[1] Principal Lucabaugh announced that Munroe had a "legal right" to blog about her students and a "right to return" to CB East. He also indicated that a transfer "would be both irresponsible and further disruptive."

media tour, *see id.* ("I will not be drug [sic] into the mud of TV news entertainment . . . ."), and that "Fox news ha[d] called [him] 6 times . . . to appear on the Justice with Jeannie [sic] show," *id.*

Against this background, I am persuaded that Munroe has, at a minimum, created a jury question about whether her media interviews factored into the discharge decision. Nothing the School District has argued convinces me otherwise, *i.e.*, that the causal connection "question is so free from doubt as to justify taking it from the jury." *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004) (quoting *Naucke v. City of Park Hills*, 284 F.3d 923, 928 (8th Cir. 2002)). Despite its best attempt to shine a light on Munroe's purported poor performance as the reason for her firing, the School District's argument is unpersuasive if not disingenuous. A brief reiteration of Munroe's employment history at CB East is in order.

After being hired to teach English in 2006, Munroe was awarded tenure only four years later in March 2010, on the recommendation of Principal Lucabaugh (who also wrote of Munroe in June 2008 that "[s]he is a consummate educator with a sparkling future"). During that time, her teaching record was pristine—she received the highest mark available ("satisfactory") in eight consecutive performance evaluations. But then, on June 15, 2011—only a few months after her blog became known and she appeared on the media to defend her position in response to Lucabaugh's televised announcement—Munroe received her first unsatisfactory evaluation. Among the concerns noted was Munroe's sudden "inability to connect to . . . students and make them feel that she cares about them" as well as the "overuse of vocabulary assignments and vocabulary assessments" and "inappropriate use of a 'nanny cam' during teaching hours." Munroe's troubles carried over to the next semester when school

8

officials began dropping into her classes unannounced. The drop-ins, according to Munroe, became "calculated and unrelenting," which led to her bosses "nitpicking everything [] [she] did." Could anyone blame Munroe for believing they "had an agenda"?

Seven unannounced observations later, Munroe received her second unsatisfactory evaluation on January 20, 2012. Not unexpectedly, she received a third and final unsatisfactory evaluation on June 1, which highlighted her continued performance issues and failure to submit lesson plans using the "Central Bucks School District designed template"—the latter a requirement to which she was never held until she began receiving unsatisfactory evaluations. Termination inevitably followed in June 2012.

In short, I have no doubt the School District was well aware that firing Munroe for her blog posts and media tour would land it in constitutional hot water. More than enough evidence suggests that firing her on performance grounds was a pretext for its real reason—she had spoken out to friends on a blog, it became public, School District officials were upset and proposed her termination, they decided to wait, the once-sterling evaluations of Munroe immediately became negative, and she was fired. The bottom line: too many signs suggest this was all a set-up that a jury needs to sort out. I thus respectfully dissent.